

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

---

### NO. PD-1067-10

---

**WALTER BRUCE CORNET, Appellant**

**v.**

**THE STATE OF TEXAS**

---

## ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE EIGHTH COURT OF APPEALS
## EL PASO COUNTY

---

PRICE, J., announced the judgment of the Court and delivered an opinion, Part IIAi of which was for the Court, and was joined by KELLER, P.J., and WOMACK, JOHNSON, and ALCALA, JJ. The remainder of the opinion was joined by KELLER, P.J., and JOHNSON and ALCALA, JJ. COCHRAN, J., filed a dissenting opinion in which MEYERS, KEASLER, and HERVEY, JJ., joined.

## O P I N I O N

The appellant was charged with three counts of aggravated sexual assault of an eight-year-old child, his step-daughter, for allegedly digitally penetrating her genitals,[1] digitally

---

[1] See TEX. PENAL CODE § 22.021(a)(1)(B)(i) & (a)(2)(B) ("A person commits an offense . . . if the person . . . intentionally or knowingly . . . causes the penetration of the . . . sexual organ of

penetrating her anus,[2] and making oral contact with her anus.[3] The trial court directed a verdict of acquittal with respect to the charge of digitally penetrating her anus, but the appellant was convicted of the two remaining charges. On appeal, the appellant complained that the trial court erred in refusing to instruct the jury on the medical-care defense to digital penetration.[4] The Eighth Court of Appeals affirmed.[5]

We granted the appellant's petition for discretionary review to address three issues with respect only to his conviction of the count pertaining to the digital penetration of the child's sexual organ: (1) whether the medical-care defense is available when the accused, a layperson with respect to medical science, is attempting to ascertain information regarding the existence of a relevant medical fact, (2) whether the doctrine of confession and avoidance

---

a child by any means . . . and . . . if . . . the victim is younger than 14 years of age[.]")

[2] *See id.* ("A person commits an offense . . . if the person . . . intentionally or knowingly . . . causes the penetration of the anus . . . of a child by any means . . . and . . . if . . . the victim is younger than 14 years of age[.]").

[3] *See* TEX. PENAL CODE §§ 22.021(a)(1)(B)(iv) & 22.021(a)(2)(B) ("A person commits an offense . . . if the person . . . intentionally or knowingly . . . causes the anus of a child to contact the mouth . . . of another person, including the actor . . . and . . . if . . . the victim is younger than 14 years of age[.]").

[4] *See* TEX. PENAL CODE § 22.021(d) ("The defense provided by Section 22.011(d) [Section 22.011 defines the offense of non-aggravated sexual assault] applies to this section."); TEX. PENAL CODE § 22.011(d) ("It is a defense to prosecution . . . that the conduct consisted of medical care for the child and did not include any contact between the anus or sexual organ of the child and the mouth, anus, or sexual organ of the actor or a third party.").

[5] *See Cornet v. State*, No. 08-09-00054-CR, 2010 WL 2396799, at *4 (Tex. App.—El Paso June 16, 2010) (not designated for publication).

applies to the medical-care defense, such that a defendant attempting to claim the defense must "essentially admit" to each element of sexual assault, including digital penetration of the sexual organ, and (3) if so, whether the defensive evidence in this case amounts to a concession of the elements of the offense, thus rendering the trial court's refusal to instruct the jury on the defense erroneous. We respond to all three issues in the affirmative, and therefore reverse the judgment of the court of appeals.

## I. FACTS AND PROCEDURAL POSTURE

In June 2006, forensic interviewer Laura Moreno-Frescas conducted a video-taped interview with eight-year-old K.M., on suspicion that the child had been sexually abused by her mother's first husband, Brian Valentine. During the course of the interview, K.M. made various statements causing Moreno-Frescas to suspect that she may have also suffered sexual abuse at the hands of her mother's current husband, the appellant. Specifically, K.M. told Moreno-Frescas that the appellant had, on one occasion, told K.M. to sit on his face, and had thereupon made oral contact with her anus. K.M. also drew a picture illustrating what she alleged had transpired, and she went on to state that the appellant had, on one occasion, showed her various "sex toys" and that he had placed one between her legs so that she could "feel the vibration."

A witness to this interview, Detective Jaime Terrazas, informed K.M.'s mother and the appellant of what K.M. had alleged. Upon learning that he was suspected of sexually assaulting K.M., the appellant voluntarily participated in a non-custodial interview with

Detective Terrazas. The appellant's responses were reduced to a formal written statement, which, in relevant part, reads:

> I suspected my step[-daughter] had problems because she had devulged [sic] to me that she had sex with both of her brothers, which caused me great concern. [O]n one particular incident, I had physically examined my step daughter because she [said she] had secrets which I believed were sexual in nature . . . This made me want to exam [sic] her to see if she had any physical evidence of sexual contact or injury.

> I layed [sic] her down on the bed in my master bedroom and proceeded to exam [sic] her. . . I had spread her legs while she was on her stomach while I opened her buttocks to check her anus and labia. I visually inspected her genetal [sic] area and remember my fingers getting wet which she may have thought was my licking anus [sic]. My fingers made contact with her anus but it was only during the time that I was examining her . . .

> My fingers also made contact with her labia, which I spread to see if her hymen was still intact because at her age, I did not know if it would have been developed. After examining the child, I noticed that she did not have a hymen, which I did not know if it had been developed or had been broken. The examination was inconclusive and her anus did not appear to be streached [sic] [or] ripped.

The appellant signed this statement, and he placed his initials upon it in several places to signify that it comported with his understanding of the events.

## A. At Trial

The appellant was charged in a three-count indictment with aggravated sexual assault of a child. One of the counts alleged that he caused the penetration of K.M.'s vagina with his finger ("Count I"), one alleged that he caused the penetration of her anus with his finger ("Count II"), and one alleged that he caused her anus to come into contact with his mouth ("Count III"). At the close of the State's evidence at the ensuing jury trial, the appellant

moved for a directed verdict with regard to all three charges. The State made the following argument against that motion, referring to the appellant's statement to Detective Terrazas: "In the defendant's own words, your [sic] Honor, he says he spread her labia . . . . I have some very graphic case law that indicates once you break the plane of the labia . . . that equals penetration. In his own words he says that." The trial court ultimately granted a directed verdict with respect to Count II, but refused the appellant's motion for a directed verdict on Counts I and III.

The appellant then took the stand to testify on his own behalf. On direct examination, when asked if he had ever "insert[ed] [his] finger in the vagina of [his] step-daughter," the appellant responded, "No. I have no business doing that." He was also asked whether he had "ever touch[ed] any areas [he] would consider her private parts"; but before the appellant could respond, this question was immediately rephrased to inquire whether he had "invade[d] any of those areas." The appellant then responded, "No, I did not have to, I was looking for external signs of any injuries." The appellant maintained that he had "spread her cheeks . . . to look to see if there was any swelling, any scarring, any indication externally that she had been injured."

During the jury-charge conference, the appellant requested that the jury be instructed on the medical-care defense to aggravated sexual assault. The court, apparently reading from the litany of medical professions described in Sections 22.011(c)(3) and (4),[6] concluded

---

[6] *See* TEX. PENAL CODE §§ 22.011(c)(3), 22.011(c)(4) ("Health care services provider" means

that the defense was limited in its application to use by licensed medical professionals, and thus denied the appellant's requested instruction. In its closing argument, the State directed the jury to "look at [the appellant's written statement]. Tell me that doesn't give you a picture of what's going on in his mind and what he's doing . . . . [D]oes he confess to doing it? Well, yeah, I think, in there." The jury returned a verdict of guilty with respect to Counts I and III and assessed punishment at ten years' confinement for each count of aggravated sexual assault, to run concurrently, and a fine of $7,500.

## B. On Appeal

On appeal, the appellant complained that the trial court erred in refusing to instruct the jury on the defense of medical care. In an unpublished opinion, the court of appeals made a two-pronged ruling. First, while admitting that the case presented an "extremely close call,"[7] it held that there existed no evidence at trial showing that the appellant admitted to the offense, and that, therefore, the trial court did not err in refusing to grant the instruction.[8] In its second prong, the court of appeals went on to hold that, in any event, the defense "is not

---

a physician, chiropractor, physical therapist, physician assistant, or nurse; and "Mental health services provider" means, among other things, a licensed social worker, chemical dependency counselor, licensed professional counselor, licensed marriage and family therapist, or psychologist offering psychological services). Section 22.011(b)(9) of the Penal Code, to which this provision refers, says that "[a] sexual assault . . . is without the consent of the other person if . . . the actor is a mental health services provider or a health care services provider who causes the other person . . . to submit or participate by exploiting the other person's emotional dependency on the actor[.]"

[7]    *Cornet*, *supra*, at *3.

[8]    *See id.* at *4.

meant to apply . . . in cases . . . when the parent suspects his child has been sexually abused and proceeds, without any medical education, training, or experience, to examine the area."[9] We review these determinations in reverse order, as we consider the latter holding to be logically precedent to the former.

## II. ANALYSIS

Sections 22.021(a)(1)(B)(i) and 22.021(a)(2)(B) of the Texas Penal Code state that a person commits aggravated sexual assault, a felony of the first degree, if the person intentionally or knowingly causes the penetration "by any means" of the anus or sexual organ of a child younger than 14 years of age.[10] Section 22.021(d) provides, by reference to Section 22.011(d), that "it is a defense to prosecution . . . that the conduct [constituting the offense] consisted of medical care for the child and did not include any contact between the anus or sexual organ of the child and the mouth, anus, or sexual organ of the actor[.]"[11]

### A. Availability of the Defense

We turn first to the holding of the court of appeals that the appellant's conduct did not fall within the purview of the defense because "the statute is not meant to apply . . . in cases

---

[9] *Id.*

[10] *See* notes 1 & 2, *ante*.

[11] TEX. PENAL CODE §§ 22.021(d), 22.011(d).

. . . when the parent suspects his child has been sexually abused and proceeds, without any medical education, training, or experience, to examine the area."[12]  We are called upon, in addressing this issue, to interpret the statutory language of the medical-care defense—what does it mean, in the context of digital penetration, for conduct to "consist[] of medical care"?

Nearly two decades ago, in *Boykin v. State*, this Court declared that its ultimate goal in the practice of statutory interpretation is to "effectuate the 'collective' intent or purpose of the legislators who enacted the legislation."[13]  In effectuating this collective intent, we must look first to the text of the statute itself, because "the text is the only *definitive* evidence of what the legislators . . . had in mind when the statute was enacted into law."[14] Looking to the text of the statute, we initially ascertain whether a plain-meaning interpretation is possible—that is, whether the text has a non-ambiguous meaning on its face.  If so, we consider whether the adoption of that interpretation would produce "absurd consequences that the Legislature could not *possibly* have intended"; and if the plain-meaning interpretation generates no such absurdities, we adopt that interpretation.[15]

If, on the other hand, an ambiguity or absurdity arises, we are permitted to peer behind

---

[12]  *Cornet*, *supra*, at *4.

[13]  818 S.W.2d 782, 785 (Tex. Crim. App. 1991) (citing *Camacho v. State*, 765 S.W.2d 431 (Tex. Crim. App 1989)).

[14]  *Id.*

[15]  *Id.*

the statutory text and employ limited extra-textual sources in adopting an interpretation that best honors the will of the Legislature. These include the "object sought to be attained; circumstances under which the statute was enacted; legislative history; common law or former statutory provisions, including laws on the same or similar subjects; consequences of a particular construction; administrative construction of the statute; and title (caption), preamble, and emergency provision."[16] We resort to these sources "out of absolute necessity," and only insofar as they do not "add or subtract from [the] statute."[17] We must take care, when searching beyond the text to find meaning, that we do not substitute our judgment for that of the Legislature in giving effect to a statutory provision.

### i. Non-Medical Professionals

Turning first to the question of whether non-medical professionals are precluded from claiming the defense, we note that, while the court of appeals did mention that the medical-care defense sometimes encompasses "treatment of infections or injuries by the parent," it went on to cast doubt on the appellant's claim to the defense, observing that he lacked "medical education, training, or experience."[18] It further concluded that such inspections

---

[16] TEX. GOV'T CODE § 311.023 (internal numbering omitted).

[17] Boykin, supra, at 785 (quoting Coit v. State, 808 S.W.2d 473, 475 (Tex. Crim. App. 1991)).

[18] Cornet, supra, at *4.

"should be left to the medical professional."[19] To the extent that such language implied that the availability of the medical-care defense turns upon the accused's familiarity with the science of medicine, we reject any such notion.[20]

This conclusion derives from the plain language of Section 22.011(d). The text of the statute makes it abundantly clear that it is the nature of the "conduct," not the occupation of the actor, that characterizes the availability of the defense.[21] Nowhere in that section is there any mention or suggestion that the availability of the defense is limited to health-care professionals; and for this Court to read such a restriction into the defense would impermissibly "add or subtract from [the] statute."[22]

Furthermore, we have said that when the Legislature desires to convey a certain level of specificity within a statutory provision, it knows how to do it.[23] For example, Section

---

[19] *Id.*

[20] To the contrary, as the Ninth Court of Appeals has aptly observed: "Daily, throughout the world, parents administer 'medical care' to their children . . . [and] on many occasions lives are saved through the administration of 'medical care' by non-licensed persons." *Lynch v. State*, 952 S.W.2d 594, 597 (Tex. App.—Beaumont 1997, no pet.).

[21] *See* TEX. PENAL CODE § 22.011(d) ("It is a defense . . . that the *conduct* consisted of medical care for the child . . .") (emphasis added).

[22] *Boykin*, *supra*, at 785.

[23] *See, e.g., Long v. State*, 931 S.W.2d 285, 290 (Tex. Crim. App. 1996) ("[H]ad the legislature intended to apply a reasonable person standard, they easily could have specified one, or a clear synonym."); *Hatch v. State*, 958 S.W.2d 813, 816 (Tex. Crim. App. 1997) ("Chapter 62 of the Government Code shows that the Legislature knew how to restrict statutes to civil cases. For

22.04(k) of the Penal Code says that it is a defense to the crime of causing injury to a child that the "act or omission consisted of . . . reasonable medical care *occurring under the direction of or by a licensed physician* [or] emergency medical care administered in good faith and with reasonable care *by a person not licensed in the healing arts*."[24] That Section 22.011(d) refers simply to "medical care," and does not, as Section 22.04(k) does, provide for different standards according to the medical savvy of the person claiming the defense, suggests two things: first, that the Legislature did not intend for Section 22.011(d) to exclude from its coverage any group of persons on the basis of their training in or familiarity with the "healing arts," and second, that the same standard for the defense should apply to all persons, health-care professional or not, who can otherwise validly claim the defense based on their conduct.

### ii. "Mere" Inspections

Next we address the question of whether the defense is available when the penetrative conduct consisted of a "mere" medical inspection. Again we start with the particular language of the statute itself, asking whether the phrase "medical care" plainly encompasses such inspections. We have often turned to dictionaries as an aid in discerning what the Legislature intended in adopting particular language in a statute and whether its meaning is

---

example, the very next section of the Texas Government Code, Section 62.202, is restricted to 'a civil case.'").

[24] TEX. PENAL CODE § 22.04(k).

plain.[25]  In consulting dictionaries for the meaning of a particular word, we look to the lexicographical alternatives that the Legislature most likely had in mind, taking into account the context provided by the phrase, subsection of the statute, and overall statutory scheme in which the word appears.  The question, then, is not whether the word "care" by itself should be understood to embrace the concept of "inspection," but whether the whole phrase "medical care" does.

Webster's Third International Dictionary defines "medical" as "of, relating to, or concerned with physicians or the practice of medicine[.]"[26]  This near-tautological definition begs the question: what is "medicine"?  Again consulting Webster's, we see that it defines "medicine" as, in relevant part, "the science and art dealing with the maintenance of health and the prevention, alleviation, or cure of disease[.]"[27]  Thus, if indeed the Legislature intended to include examinations as protected conduct under the defense, there is a strong inference, from the Legislature's inclusion of the word "medical," that the Legislature sought only to protect examinations insofar as they are medically relevant—that is, relevant to the state of the child's health and well-being.

Having attained some understanding of the modifier "medical," we must be cautious

---

[25] See, e.g., Ex Parte Reick, 144 S.W.3d 510, 512 (Tex. Crim. App. 2004).

[26] Webster's Third New International Dictionary 1402 (2002).

[27] Id.

in searching for meaning in the word "care" that we limit ourselves to definitions of the word that make sense in the context of the phrase "*medical* care." To that end, we find that *Webster's* relevantly defines "care" as "CHARGE, SUPERVISION, MANAGEMENT: responsibility for or attention to safety and well-being ‹under a doctor's ~›[.]"[28] It is evident to us that even the simple inspection of a child's anatomy, if conducted for medical purposes, is consistent with the "responsibility for or attention to the safety and well-being" of that child. We would not hesitate to say so were that inspection conducted by a physician, physician's assistant, nurse, or other trained professional. Surely the Legislature meant for the medical-care defense to immunize from prosecution medically trained professionals who examine victims of child sexual assault for medically motivated purposes. A parent or other person *in loco parentis* ordinarily assumes at least as great a responsibility for the safety and medical well-being of his child. We think it would dishonor the legislative intent, expressed in its very choice of words, to construe the phrase "medical care" so rigidly as to exclude inspections, whether conducted by trained medical personnel, by a parent, or by another adult acting *in loco parentis*, when those inspections are undertaken for the medical benefit of the child.

The State opposes the inclusion of medical inspection within the contours of the defense, asserting that the plain meaning of "medical care" adopted in the statute is, according to the State's preferred dictionary, "medical *treatment*."[29] It further avers that, had

---

[28] *Id*. at 338.

[29] State's Brief at 15 (citing *Medical Care*, Dictionary.com,

the Legislature intended to protect conduct aiming to merely ascertain the state of the child's health, it could have adopted the language "ascertain the need for medical care" or "ascertain if the child was injured." Such exercises in hypothetical counter-drafting are especially risky where, as here, the term proffered as a corrective synonym ("medical treatment") has been used elsewhere within the Penal Code.[30]  We think it more plausible that, had the Legislature intended to protect "medical treatment" alone, it would have expressly adopted the language of "medical treatment."  For these reasons, we conclude that the medical-care defense may be raised by evidence supporting a "mere" medical inspection.

### iii.  The Appellant's Claim to the Defense

Measured by these criteria, and putting aside for the moment the question (to which we will turn next) whether it is a confession-and-avoidance type of defense,[31] we think the evidence at trial raised the issue of whether the appellant's conduct legitimately consisted of medical care.  In his written statement to Detective Terrazas, the appellant claimed that he examined K.M. "to see if she had any physical evidence of sexual contact or injury," and that

---

http://dictionary.reference.com/browse/medical+care) (emphasis added).

[30]

See TEX. PENAL CODE § 22.06(a)(2)(B) ("The victim's effective consent . . . to the actor's conduct is a defense to prosecution [for non-sexual assault] if . . . the victim knew the conduct was a risk of . . . recognized *medical treatment*[.]" (emphasis added)).

[31]

If the medical care defense is in the nature of a confession-and-avoidance type of defense, then the appellant may not be entitled to an instruction without "an admission to the [otherwise prohibited] conduct, which includes both the act or omission and the requisite mental state." *Juarez v. State*, 308 S.W.3d 398, 404 (Tex. Crim. App. 2010).  We address whether the medical care defense is of such a nature in Part IIB, and (concluding that it is) whether the evidence in this case satisfies the admission-of-the-prohibited-conduct requirement, in Part IIC, *post*.

the examination came to a halt once he "determined there was nothing wrong with the child." At trial, the defendant testified that, in conducting the examination on K.M., he "wanted to find out that she was okay," and that he "just wanted to take a look to see if there was any swelling, any scarring, any indication externally that she had been injured." The appellant's written statement also indicates that he had good reason to suspect that the child had been abused before, making an examination of the area all the more likely to turn up signs of abuse. This evidence, if believed by the jury, would support a rational inference that the appellant's touching of the child was, in fact, an inspection for a medically relevant purpose. This being the case, it was not proper for the trial court to deny the appellant a jury instruction on the medical-care defense either on the basis of his lack of knowledge with regard to the subtleties of the field of medicine, or on the basis of his failure to administer a medical treatment *per se*. We believe that the court of appeals was therefore mistaken to the extent that it suggested otherwise.

## B. Confession and Avoidance

We turn next to the holding of the court of appeals that the medical-care instruction is inappropriate "when the defendant's defensive evidence fails to essentially admit to every element of the offense."[32] This statement, without employing the term, amounts to a ruling that the doctrine of confession and avoidance applies to the defense of medical care. The Eighth Court is not alone in so holding; as the State points out in its brief, the First Court of

---

[32] *See Cornet*, *supra*, at *3.

Appeals has reached a similar conclusion.[33]

A defense subject to the doctrine of confession and avoidance is one in which "a defendant admits allegations but pleads additional facts that deprive the admitted facts of an adverse legal effect."[34] This Court has held that the doctrine of confession and avoidance applies to the medical-care exception to the offense of causing injury to a child—sometimes referred to as the "Good Samaritan" defense.[35] While the rationale for that application involved the similarity between the Good Samaritan defense and the justification of necessity,[36] which is an established confession-and-avoidance type of defense,[37] we think that the similarity between the subject-matter of the Good Samaritan defense and the medical-care defense weighs heavily in favor of the application of the doctrine to the latter. Like the Good Samaritan defense, the medical-care defense "does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal

---

[33]
*See Callis v. State*, No. 01-89-00159-CR, 1990 WL 68465, at *3 (Tex. App.—Houston [1st Dist.] May 24, 1990, no pet.) (not designated for publication).

[34]
*Black's Law Dictionary* 339 (9th ed. 2009).

[35]
*See Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007).

[36]
*See Shaw*, *supra* (the Good Samaritan defense "operates as a kind of particularized example of the justification of necessity").

[37]
*See Juarez, supra*, at 404 (citing, in support of this assertion, *Ex parte Nailor*, 149 S.W.3d 125, 133 (Tex. Crim. App. 2004); *Bowen v. State*, 162 S.W.3d 226, 230 (Tex. Crim. App. 2005); *Young v. State*, 991 S.W.2d 835, 839 (Tex. Crim. App. 1999); *Vasquez v. State*, 830 S.W.2d 948, 950-51 (Tex. Crim. App. 1992); *Thomas v. State*, 678 S.W.2d 82, 85 (Tex. Crim. App. 1984)).

conduct."[38]  Indeed, both defenses deal with justifying otherwise-harmful conduct toward a child on the grounds that the conduct was in the best medical interests of the child. Consequently, any attempt to apply the doctrine differently across these two thematically similar defenses swims against the current.

The appellant points out, nevertheless, that this Court recently pronounced, in *Juarez v. State*, that "the doctrine of confession and avoidance does not apply to all defensive issues."[39]  Indeed, the appellant's statement is accurate, as far as it goes; but it should have gone further.  We clarified, in *Juarez*, that the defensive issues the doctrine does *not* apply to are those that "by [their] terms, negate[] the culpable mental state" required for commission of the offense.[40]  But the medical-care defense does not, "by its terms," negate the necessary culpable mental states of intent or knowledge; as mentioned above, it merely justifies what would otherwise be an unlawful touching of a child.[41]

The appellant furthermore questions the consistency of this Court's holdings, arguing that we ignored the doctrine of confession and avoidance, specifically as it applies to self-

---

[38]

 *See Shaw*, *supra*, at 659.

[39]

 Appellant's Brief at 5 (citing *Juarez*, *supra*, at 402).

[40]

 *See Juarez*, *supra*, at 402.

[41]

 It should be noted that Section 22.021 does not require the State to prove that the assaultive conduct it proscribes be committed with a specific lascivious intent.

defense, in *Martinez v. State*.[42]  We need not determine whether *Martinez* altogether abandoned the doctrine of confession and avoidance in the context of self-defense.[43]  But even if it were true that *some* non-element-negating defenses (such as, for instance, self-defense in the context of murder) were somehow immune from the requirements of confession and avoidance, a mere reference to this legal anomaly, absent any sort of analogical reasoning, would not constitute an argument against applying the doctrine to the justification of medical care—and would not, therefore, suffice to overcome the strong thematic similarity between the Good Samaritan defense to causing injury to a child and the medical-care defense to digital penetration of a child's anus or genitals.  The decision of the court of appeals in this respect is, therefore, affirmed.

### C.  Did the Appellant sufficiently admit to penetration?

We turn lastly to the holding of the court of appeals that "none of the evidence presented at trial shows that Appellant admitted to the offense."[44]  It made this ruling with respect to the element of penetration in aggravated sexual assault, on the basis that the

---

[42]

775 S.W.2d 645, 647 (Tex. Crim. App. 1989);  *see also Juarez*, *supra*, at 403 ("[*Martinez*] ignored the confession and avoidance doctrine altogether.").

[43]

But we note that in *Juarez*, *supra*, at 401-403, we treated *Martinez* as little more than a legal anomaly and pointed out that we have, since *Martinez,* re-emphasized the applicability of confession and avoidance to self-defense, at least as it relates to misdemeanor assault, in *Ex parte Nailor*, *supra*, at 132-34.

[44]

*See Cornet, supra*, at *3.

appellant "expressly denied ever penetrating K.M.'s sexual organ with his finger or that he invaded her private parts."[45]   In order to determine whether the appellant sufficiently confessed to the act of penetration, we must first undertake to examine what it means to "penetrate" in the context of sexual assault, and what it means to "admit" to conduct in the context of confession and avoidance.

With respect to "penetrate," as the court of appeals correctly noted, this Court has held that penetration occurs when there is "tactile contact beneath the fold of complainant's external genitalia," and that it is not inaccurate "to describe [conduct] as a penetration, so long as [the] contact  with [the complainant's] anatomy could reasonably be regarded by ordinary English speakers as more intrusive than contact with her outer vaginal lips."[46]  In *Vernon*, the defendant was charged with and convicted of aggravated sexual assault of his thirteen-year-old step-daughter.  The Second Court of Appeals affirmed the defendant's conviction, in spite of testimony by the complainant that the defendant had only touched the "outside" of her vaginal area.  In affirming the court of appeals, this Court noted that the statute does not criminalize penetration of the *vagina*, but the broader conduct of "penetration of the . . . sexual organ" of the child.[47]  We went further to say that "pushing aside and

---

[45]

   *Id.*

[46]

   *See Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992).

[47]

   *Id.* (quoting the contemporary equivalent of TEX. PENAL CODE § 22.021(a)(1)(B)(i)).

reaching beneath a natural fold of skin into an area of the body not usually exposed to view, even in nakedness, is a significant intrusion beyond mere external contact[,]"[48] and therefore constitutes penetration in the context of sexual assault.

As for "admitting" conduct under the doctrine of confession and avoidance, it is sufficient that the defendant point to defensive evidence, originating in his own statements, such that a trier of fact could reasonably infer that each element of the offense has been satisfied.[49] In *Juarez*, for example, the defendant, while pinned to the ground and allegedly fearful for his life, bit down on a police officer's finger and, for a protracted period of time, refused to let go—an act for which he was indicted on one count of aggravated assault on a peace officer. In attempting to receive a jury instruction on the defense of necessity, the defendant testified that he "just bit down *to get him off of me*, because I felt like I was going to die[,]"[50] but nevertheless maintained that he never intentionally, knowingly, or recklessly bit the officer's finger. We concluded, after carefully considering the defendant's own testimony, that the jury could reasonably infer from the character of his self-described conduct that he bit the officer intentionally, knowingly, or recklessly,[51] notwithstanding the

---

[48] *Id.*

[49] *See Juarez, supra*, at 406.

[50] *Id.* at 400 (emphasis added).

[51] *Id.* at 405-406.

fact that he expressly denied having harbored such an intent. On this basis, we held that the defendant had satisfied the requirements of confession and avoidance and was therefore entitled to a jury instruction on necessity.

In the instant case, there are two relevant pieces of evidence, each originating in the appellant's own statements, that tend to show the appellant's admission to the commission of penetration: his written statement, and the testimony he gave at trial. In his written statement, the appellant admitted that "[his] fingers also made contact with her labia, which [he] spread to see if her hymen was still intact." He also stated that he "remembered [his] fingers getting wet." At trial, the appellant testified that he had "spread her cheeks" in order to ascertain whether or not she had been sexually abused. We think that these statements, taken together, constitute evidence sufficient to establish confession in the context of confession and avoidance—that is, we think it would be reasonable for a fact-finder to infer from the appellant's defensive evidence that he admitted to penetration as it is described in *Vernon*. Specifically, a fact-finder could reasonably infer that his fingers were wet because he "reached beneath the natural fold of skin" of K.M.'s labia and entered "an area of the body not usually exposed to view, even in nakedness";[52] that in order to make the hymen visible, the appellant would have to make some contact with the child's genitals that could "reasonably be regarded . . . as more intrusive than contact with her outer vaginal lips";[53] and

---

[52] *Vernon*, *supra*.

[53] *Id.*

that the appellant crossed the legal line demarcating penetration when he, as he testified at trial, "spread her cheeks."

The State argues to the contrary that the appellant vehemently denied penetration at trial, and that such denial precludes him from satisfying the requirement of confession. While we decline to address the latter part of this argument, we take issue with its premise. We are not convinced that the appellant denied penetration at all, in the legal sense of the word. A review of the record establishes that, when asked if he had ever "*insert[ed] [his] finger* in the *vagina* of [his] step-daughter," the appellant responded, "No. I have no business doing that." As noted above, vaginal penetration is not the legal standard prescribed in the statute—penetration of the "sexual organ" is. This testimony, therefore, is not necessarily a denial of the element of penetration; it is more plausibly understood as a denial by the appellant of inserting his finger past the outer and inner labia and into the child's vaginal canal. The element of penetration may be satisfied by less than this.

Furthermore, the appellant was also asked, "[D]id you ever touch any areas that you would consider her private parts? Did you ever invade any of those areas?" He again responded "No, I did not have to, I was looking for external signs of any injuries." The appellant's negative response to this question is somewhat ambiguous—did he deny "touch[ing]" the child's "private parts," or did he deny "invad[ing]" them; or did he deny both acts? And what, specifically, did the appellant interpret the prosecutor to mean by her "private parts"? Even if the jury believed the appellant was denying "invad[ing]" the child's

"private parts," it could still find that the appellant did not deny that he had committed penetration in the legal sense. The term "invade" carries a much different common meaning than the term "penetrate";[54] accordingly, the jury might have taken the appellant's denial of invasion as a mere denial of an *inappropriate* touching of the child. If, on the other hand, the jury took the appellant's response as a denial that he "touch[ed] her private parts," it could be argued that "private parts" are not necessarily the same thing as "sexual organ[s]." The jury might well have believed, especially in light of counsel's immediately preceding question—"[D]id you ever put a finger into her vagina?"—that the appellant interpreted counsel's use of the term "private parts" to refer specifically to her vagina. In that case, once again, the jury might have thought that the appellant did not, strictly speaking, deny what it would have been entitled under *Vernon* to regard as the penetration of K.M.'s sexual organ.

For the foregoing reasons, while we agree with the court of appeals that the issue presents an "extremely close call,"[55] we conclude that sufficient evidence existed at trial to show that the appellant essentially admitted, under the doctrine of confession and avoidance, to the element of penetration. The court of appeals erred to the extent that it held otherwise.

### III. CONCLUSION

In light of our resolutions of the three foregoing issues, we hold that the court of

---

[54]

And indeed, the term "penetrate" was not used at all in connection with examining or cross-examining the appellant.

[55]

*Cornet*, *supra*, at *3.

appeals erred to affirm the trial court's decision to deny the appellant a jury instruction regarding medical care to the charge of digitally penetrating the victim's sexual organ. Accordingly, we reverse the judgment of the court of appeals and remand this case to that court to determine the extent of the harm, if any, resulting from the trial court's error.[56]

DELIVERED:     January 25, 2012
PUBLISH

---

[56] *See Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) ("If the error in the charge was the subject of a timely objection in the trial court, then reversal is required if the error is calculated to injure the rights of defendant, which means no more than that there must be *some* harm to the accused from the error.") (internal quotation marks omitted); *see also Miller v. State*, 815 S.W.2d 582, 585-86  (Tex. Crim. App. 1991) (discussing the harm analysis of *Almanza* as it applies to a trial court's failure to give a defensive instruction that was raised by the evidence).