**REFORM and AFFIRM; and Opinion Filed August 20, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

_____

### No. 05-14-00824-CR
_____

**STEVEN LEE GORDON, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 219th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 219-81751-2013**

## MEMORANDUM OPINION
Before Justices Francis, Brown, and Stoddart
Opinion by Justice Brown

A jury convicted Steven Lee Gordon of criminal solicitation of capital murder after finding he paid someone to kill his wife. The trial court assessed punishment at sixty years in prison. On appeal, appellant challenges the legal and factual sufficiency of the evidence to support (1) the jury's rejection of his affirmative defense of renunciation and (2) the trial court's rejection of his renunciation defense at punishment. He also complains about errors in the judgment. We conclude his sufficiency issues are without merit but sustain in part his complaints regarding the judgment. We modify the judgment and affirm as modified.

Appellant met Oprensie Juhol during a business trip to Malaysia, subsequently married her, and had three children. After he became addicted to Ambien and Xanax, quit working, and was sleeping all the time, Juhol told him she wanted a divorce. Worried that she would take their

children to Malaysia, appellant posted an item on craigslist.com wanting information on how to get her green card revoked. Robert Bass responded.

Bass told appellant he had an uncle who worked as a police officer and was nearing retirement. Bass said he could get his uncle to plant drugs in Juhol's vehicle and have Juhol stopped and arrested for drug possession, which would result in her being deported. Appellant met Bass and gave him $5000 to execute the plan. A few days later, appellant gave Bass an additional $4000 for the uncle to get appellant's sentence for prescription fraud reduced by setting him up as an informant.

Shortly after getting paid, Bass told appellant his uncle could not stop Juhol's vehicle because of some issue with Immigration and Customs Enforcement (ICE). At that point, appellant and Bass came up with a new plan to kill Juhol, and appellant gave Bass an additional $15,000. The murder was supposed to occur on May 7, 2013, while appellant was in court-ordered rehab for prescription fraud so that he would have an alibi. Appellant went into rehab as scheduled. When he had not heard anything two days later, he left rehab and learned Juhol was not dead. Appellant was told the shooter, who was reportedly Bass's brother or nephew, had fled to Arizona because he believed he had been identified.

At that point, appellant paid Bass another $10,000 to hire a second shooter, "Bruno." As before, appellant went into rehab so that he would have an alibi. Again, appellant left rehab early and found that Juhol had not been killed. That night, May 19, appellant told Juhol someone had tried to kill her. When she asked why, he told her "you bump on people," which Juhol understood to mean that she hurt people's feelings. He also said that some people "hate foreigners." Appellant left the house and said he was going to the police, but Juhol said he returned too quickly for him to have actually gone to the police station.

That same night, appellant sent a series of texts to Bass questioning why the murder had not occurred and wanting Bass to "take her out tonight." He asked, "Is it going to be done or are you walking away from this leaving me screwed?" He said he was able to come up with the "25 grand that Bruno wants for the job" and asked if he would still do it. Appellant asked if it could be done that night, and said the door was unlocked and there was no company. Appellant threatened to go to internal affairs and report Bass's uncle if the murder was not done.

Bass responded the next morning with several texts:

> It was scheduled. For the 21st. To give u time to clear urself.
>
> How dar u threaten my unc. . . If u were just a little bit more patience [sic]. . .
>
> You don't need to no [sic] when . . . it was going to be done . . .
>
> But u threaten my uncl
>
> This is bruno…you want to threaten AB..? We will teach u a lesson.. About AB….mother fucker

AB was identified as the Aryan Brotherhood.

Worried that he had become the target, appellant immediately went to the Allen Police Department, where he talked to Sgt. Marshall DeBlanc in the Internal Affairs Division and Cpl. Christopher Mayfield in the Criminal Investigations Division. The interviews were recorded and played for the jury. In the interviews, appellant recounted how he placed a post on craigslist to get his wife deported and how it turned into a murder plan. Appellant, however, claimed that he went along with the murder plan because Bass threatened him and he was trying to get information so that he could go to the police. Several times during the interview, appellant voiced concern that he had left his court-ordered rehab early and wanted DeBlanc to contact his probation officer so that he would not be jailed. As part of their investigation, the police followed appellant to his bank, where he obtained bank receipts showing that he had deposited

–3–

almost $31,000 from a Fidelity account into his bank account on April 29, 2013, and then withdrawn $28,000 in cash three days later.

After investigating appellant's story, police arrested appellant later that day and had Bass arrested the next day. The police also concluded "Bruno" and the first shooter were "completely fictitious" and found no evidence of a "corrupt cop." Rather, Bass was a "con" with multiple arrests. Both DeBlanc and Mayfield agreed that there was no existing investigation into Bass and the police would not have known about the plot against Juhol if appellant had not come forward.

After hearing the evidence, the jury rejected appellant's affirmative defense of renunciation and found him guilty of criminal solicitation of capital murder. Appellant elected for the trial court to determine punishment. At the punishment hearing, Juhol testified that a couple of months before this offense, appellant made her a cup of instant coffee. Afterwards, while driving to a doctor's appointment, she was sleepy, her heart was racing, and she had trouble breathing. The next day, appellant made her coffee again. This time, she noticed her coffee had a white powder in it and did not drink it. Each time after that, she said her instant coffee had white powder in it, and appellant would then call her at work and ask how she was feeling. Ultimately, she checked her container of instant coffee and saw white powder in it. She gave the container of coffee to a friend to hold for her until she took it to the Allen police. The police sent it to a lab, where it tested positive for Ambien.

Appellant testified at punishment and denied putting Ambien in his wife's coffee. Rather, he suspected his wife poisoned him, explaining that he became ill after his wife returned from a trip to Malaysia in 2010 and lost 120 pounds over a period of about six months.

When asked why he hired someone to kill Juhol instead of just divorcing her, he said it was "difficult to answer" but explained he became "enraged." He acknowledged his choices

–4–

were bad and said he was ashamed of himself. He said the idea was to have her deported and then changed to a murder plan, which he was "uncomfortable" with but "went along with it." He claimed he "tried to put a stop to it early on" by telling Bass he was going to the police, but Bass responded with threats, leaving him "stuck between a rock and hard place." He ultimately went to police because he "just couldn't do that to [his] children." Appellant asked for a renunciation finding, but the trial court rejected his request.

In his first and second issues, appellant contends the evidence was legally and factually insufficient to support the jury's rejection of his affirmative defense of renunciation.

We may review a jury's rejection of an affirmative defense for legal and factual sufficiency. *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015). In a legal sufficiency review, we first determine whether the record contains a scintilla of evidence favorable to the factfinder's decision and disregard all evidence to the contrary unless a reasonable factfinder could not. *Id*. (citing *Matlock v. State*, 392 S.W.3d 662, 669–70 (Tex. Crim. App. 2013)). We overturn the jury's finding only if the evidence conclusively proves his affirmative defense and no reasonable factfinder could believe otherwise. *Id*. In a factual sufficiency review, we examine the evidence in a neutral light and overturn the factfinder's decision only if it is so against the great weight and preponderance of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id*. In both reviews, we defer to the jury's determination of the credibility of the witnesses and the weight to give the evidence. *Matlock*, 392 S.W.3d at 670–71.

It is an affirmative defense to prosecution for criminal solicitation if "under circumstances manifesting a voluntary and complete renunciation of his criminal objective the actor countermanded his solicitation . . . before commission of the object offense and took further affirmative action that prevented the commission of the object offense." TEX. PENAL

CODE ANN. § 15.04(b). Thus, under the statute, a defendant must countermand the solicitation and the renunciation must be voluntary.

The penal code does not define "countermand." Where a statutory term is not defined by the Legislature, we give that term its ordinary meaning. *Morrow v. State*, 862 S.W.2d 612, 614 (Tex. Crim. App. 1993). In consulting dictionaries for the meaning of a particular word, we look to the lexicographical alternatives the Legislature most likely had in mind, taking into account the context provided by the phrase, subsection of the statute, and overall statutory scheme in which the word appears. *Cornet v. State*, 359 S.W.3d 217, 222 (Tex. Crim. App. 2012).

The term "countermand" is defined by Webster's Dictionary to mean "to revoke (a former command)" or to "cancel or rescind (an order) by giving a contrary order"; "to recall or order back by a superseding contrary order"; or "to stop or prohibit by revoking an order or issuing a contrary order." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 519 (1981). Thus, to have countermanded his solicitation of his wife's murder, appellant must have revoked, rescinded, or recalled his earlier order to Bass. Here, there is no evidence that appellant ever communicated to Bass that he did not want Juhol to be killed. To the contrary, on the night before he went to the police, he was urging Bass to "take her out" that night, telling him the door was unlocked and Juhol had "no company." So, while appellant reported the planned murder to the police, he never countermanded his solicitation of it with Bass (or Bruno).

In his brief, appellant argues he "withdrew from the conspiracy" by going to the Allen Police Department and disclosing his "solicitation on Craigslist to have his wife deported, the modification of the plan to kill his wife, and the subsequent events that led him to seek assistance" from the police. But appellant was not charged with conspiracy; he was charged with criminal solicitation. The renunciation defense under section 15.04(b) applies to two offenses, criminal conspiracy under section 15.02 and criminal solicitation under section 15.03. It requires

that "the actor countermanded his solicitation or withdrew from the conspiracy." *See* TEX. PENAL CODE ANN. § 15.04(b). But only a person charged with solicitation may countermand a solicitation and only a person charged with conspiracy can withdraw from a conspiracy. Consequently, we agree with the State that it is no defense that appellant renounced a crime for which he was not charged.

Even if we were to conclude that appellant's act in going to the police could constitute a countermand of his solicitation, the defense still does not apply because appellant's renunciation was not voluntary. Under the statute, renunciation is not voluntary if it is motivated in whole or in part (1) by circumstances not present or apparent at the inception of the actor's course of conduct that increase the probability of detection or apprehension or that make more difficult the accomplishment of the objective; or (2) by a decision to postpone the criminal conduct until another time or to transfer the criminal act to another but similar objective or victim. TEX. PENAL CODE ANN. § 15.03(c).

Appellant contends the two factors listed in subsection (c) are the exclusive means by which a renunciation defense can be rendered involuntary and there is no evidence that his renunciation was motivated by either circumstance.

This Court, however, has interpreted subsection (c) to be nonexclusive descriptions of the ways in which renunciation may not be voluntary. *See Chennault v. State*, 667 S.W.2d 299, 304 (Tex. App.—Dallas 1984, no pet.). Specifically, we have concluded the legislature did not intend for a renunciation defense to apply where the intent to kill was still present; rather, repentance or change of heart is required before renunciation is voluntary within the meaning of the statute. *Id.* We reject appellant's invitation to revisit our holding in *Chennault*.

Here, the evidence showed appellant's renunciation was not prompted by "repentence or change of heart." Rather, the evidence showed appellant went to the police out of self-interest,

fearing he had become Bruno's target. Just the night before, he urged Bass to get the job done and encouraged him to come that night. The next morning, after receiving a threatening text from "Bruno," he went to the police. During the recorded interview, he repeatedly asked for protection for himself and sought police intervention in his prescription fraud case, asking the officer to contact his probation officer to excuse him from court-ordered rehabilitation. And while he downplayed his responsibility when talking to the police, claiming he was involved only because Bass threatened him and because he was trying to get more information, a jury could have disbelieved him. Considering the evidence under the appropriate standard of review, we conclude the evidence was legally and factually sufficient for a jury to reject appellant's affirmative defense of renunciation. We overrule the first and second issues.

In his third issue, appellant contends the evidence was legally and factually insufficient to support the trial court's rejection of his renunciation mitigation issue at punishment.

Evidence that a defendant renounced his criminal objective by countermanding his solicitation before the criminal offense was committed and that he made a substantial effort to prevent commission of the object offense is admissible as mitigation evidence at the punishment phase of trial if he has been found guilty of criminal solicitation. *See* TEX. PENAL CODE ANN. § 15.04(d). If the factfinder finds the defendant renounced his criminal objective, the punishment shall be one grade lower than that provided for the offense committed. *Id.* Renunciation of an inchoate offense under section 15.04(d) is a punishment-phase affirmative defense in which the defendant has the burden of proof by a preponderance of the evidence. *Hall v. State*, 160 S.W.3d 24, 38–39 (Tex. Crim. App. 2004).

As before, the evidence supported the trial court's rejection of the renunciation defense at punishment because appellant did not renounce his solicitation of Juhol's murder. As explained previously, rather than attempt to revoke or recall the solicitation with Bass or Bruno, appellant

–8–

in fact was still trying to convince Bass to carry out the murder up until the night before he went to the police. And, even when he went to the police, he never contacted Bass and told him not to kill Juhol. In other words, there was no evidence or factually insufficient evidence that appellant countermanded his solicitation. Under these circumstances, we conclude there was legally and factually sufficient evidence for the trial court to decline to make a finding of renunciation. We overrule the third issue.

In his fourth issue, appellant requests we correct three errors in the judgment regarding the date of judgment, the statute, and the name of the offense. First, the judgment reflects judgment was entered on May 7, 2014, which is the date the jury returned the verdict. But the reporter's record shows the trial court did not sentence appellant until June 11, 2014; consequently, we agree June 11, 2014 is the correct date of judgment. Second, the judgment shows the "Statute for Offense" as "19.03(a)(3) Penal Code," which is capital murder for remuneration. Appellant was not convicted of capital murder; rather, the record shows he was convicted of criminal solicitation to commit capital murder under section 15.03(d)(1) of the penal code. Consequently, the correct statute for the offense is section 15.03(d)(1).

Third, appellant argues the judgment lists the incorrect offense for which he was convicted, solicitation to commit capital murder for remuneration, and should be corrected to criminal solicitation. Here, we disagree. The indictment alleged solicitation of capital murder and the jury specifically convicted him of that offense. Consequently, we conclude the judgment correctly identifies the offense.

We have the authority to correct a judgment below to make the record "speak the truth" when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Accordingly, we modify the judgment to correct the date judgment was entered and the statute for the offense of which appellant was convicted.

–9–

We affirm the judgment as modified.

/Ada Brown/
ADA BROWN
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

140824F.U05



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

STEVEN LEE GORDON, Appellant

No. 05-14-00824-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 219th Judicial District Court, Collin County, Texas
Trial Court Cause No. 219-81751-2013.
Opinion delivered by Justice Brown. Justices Francis and Stoddart participating.

Based on the Court's opinion of this date, we **REFORM** the trial court's judgment to show (1) judgment was entered on June 11, 2014, and (2) appellant was convicted under section 15.03(d)(1) of the Texas Penal Code.

As **REFORMED**, we **AFFIRM** the trial court's judgment.

Judgment entered this 20th day of August, 2015.