

NUMBER 13-12-00333-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

FRED LONGORIA,                                                          Appellant,

v.

THE STATE OF TEXAS,                                                    Appellee.

### On appeal from the 130th District Court of Matagorda County, Texas.

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Garza and Perkes
### Memorandum Opinion by Justice Garza

A jury convicted appellant, Fred Longoria, of aggravated sexual assault of a child, a first-degree felony. *See* TEX. PENAL CODE ANN. § 22.021 (a)(1)(B)(i), (a)(2)(B), (e) (West Supp. 2011).[1] The jury assessed punishment at life in prison and a $10,000

---

[1] Section 22.021 of the penal code was amended in 2011, but those amendments are not

fine.  By seven issues which we reorder as four, appellant contends:  (1) the evidence was insufficient to support his conviction; (2) there was a fatal variance between the alleged offense as described in the jury charge and the evidence presented at trial; (3) he was denied effective assistance of counsel; and (4) the trial court abused its discretion in failing to grant him a new punishment hearing.  We affirm.

## I.  BACKGROUND

### 1. E.L.

E.L., the alleged victim in this case, was twenty-one years old when she testified at trial.  She testified that her mother, A.L., and father split up when she was six years old.[2]  E.L. and her mother and siblings were living with David, one of her father's cousins.  In 2003, when E.L. was twelve, appellant—also a cousin of E.L.'s father—was living with Jaclyn, a second cousin to A.L.  Around this time, E.L. began using drugs and alcohol and frequently fought with A.L.

In July 2003, E.L.'s grandfather died.  After the funeral, E.L. spent the night at appellant and Jaclyn's home.  While Jaclyn was busy bathing her children, E.L. was playing on the computer.  Appellant pulled a chair up next to her, put his hand on her leg, and asked if she was a virgin.  E.L. said "yes."[3]  Later that night, E.L. was laying on

---

applicable here, and we cite to the current version of the statute.  *See* TEX. PENAL CODE ANN. § 22.021 (West Supp. 2011).

[2] The familial relationships in this case are complicated.  When E.L.'s parents split up, her father was in jail, and her mother began living with her father's cousin, David.  David's son, D.J., who was six years older than E.L., was also a member of the household.  Shortly after E.L. and her mother moved in, D.J. began sexually abusing E.L. by exposing himself and forcing her to touch him inappropriately.  After approximately two years, a relative saw D.J. rubbing up against E.L. and reported the incident.  Following an investigation by Child Protective Services (CPS), D.J. was removed from the home temporarily.  He returned, however, when E.L. was about ten, and the sexual contact with E.L. continued.  The sexual abuse eventually escalated into oral sex and intercourse and continued until E.L. was about fifteen years old.  D.J. also introduced E.L. to marijuana and cocaine when she was about eleven or twelve.

[3] E.L. had sexual intercourse with D.J. sometime after July 2003.

2

the couch where she planned to spend the night. Appellant sat on the end of the couch, put his hand under E.L.'s panties, and digitally penetrated her vagina. Appellant then stopped and said he would continue later. He was in and out of the house that night. Much later, appellant woke E.L. up and told her to follow him outside. He put her inside his truck, pulled down her panties and his pants, and partially penetrated her. Appellant was unable to fully penetrate E.L.'s vagina. E.L. later saw that she had blood in her panties. E.L. did not tell anyone about the incident.

A couple of years later, appellant was having an affair with A.L. Eventually, appellant and Jaclyn separated and appellant moved to his mother's house. For a while, A.L. was involved with both appellant and David. During this time, E.L. and her siblings were sent to live with their father. When they came back to live with A.L., they sometimes stayed at their grandparents' home because David had burned down A.L.'s apartment. A.L. was living with appellant at his mother's house.[4] E.L. and her siblings sometimes slept together in the den at appellant's mother's house. On several occasions, appellant came into the den, woke E.L. up, and "force[d] himself inside" her. E.L. was around fourteen at this time. Appellant was providing E.L. with drugs and alcohol. E.L. had been placed on juvenile probation for assaulting A.L. Appellant warned E.L. that if she told anyone about the sexual abuse, he would claim that their sexual relationship was consensual and no one would believe her. He also told her that if she told anyone, no one would want her because she was "dirty" and "nasty."

While she was on juvenile probation, E.L. continued to use drugs. As a result, her probation officer offered her a choice: accept a six-month assignment at Shoreline,

---

[4] A.L. was married to E.L's father, David, and appellant. All three men were cousins to each other.

3

Inc., a residential rehabilitation facility in Taft, Texas; or accept revocation of her probation and assignment at the Texas Youth Commission for a year. E.L. chose assignment at Shoreline.

At Shoreline, she participated in group therapy and classes on drugs, sexual abuse, physical abuse, and pregnancy. Prior to her residency at Shoreline, E.L. had not told anyone about the sexual abuse by appellant. Over time, E.L. developed a trusting relationship with Erin Wynn, one of her counselors. Eventually, E.L. told Wynn about the sexual encounters with D.J. and with appellant. Wynn arranged a meeting between herself, E.L., and A.L. After being told of the sexual abuse, A.L.'s attitude toward E.L. was cold and uncaring. E.L. interpreted her mother's reaction as confirmation of what D.J. and appellant had told her: that no one would believe her and that the sexual encounters were her fault.

Although E.L.'s assignment at Shoreline was for six months, she stayed for nine months because she did not want to return home with A.L. and appellant. Eventually, she returned home. When appellant and A.L. tried to confront her, she called her father, and he came and picked her up. E.L. believed that her father learned of the abuse from Child Protective Services (CPS). After picking her up, E.L.'s father took her to the sheriff's department in Bay City, Texas, where she gave a statement to an investigator, Charlotte Brown. E.L. stayed with her father in Houston for six months. Later, E.L. and her brother joined A.L. in Nebraska.

On cross-examination, appellant's counsel emphasized that E.L. skipped school frequently, used drugs, and assaulted A.L. on numerous occasions. He also

4

emphasized that E.L. did not report the sexual abuse by appellant to a teacher or other family members and did not seek help from the police.

## 2. Erin Wynn

Erin Wynn testified that in 2006 and 2007, she was E.L.'s counselor at Shoreline. Wynn stated that when admitted to Shoreline, E.L. had serious substance abuse problems and had emotional and behavioral problems. Wynn stated that after she learned of the sexual abuse by appellant, she contacted CPS and set up a meeting with A.L. Wynn described A.L.'s reaction at the meeting as "very disturbing" because she was "uninterested" and "uncaring" toward E.L.

## 3. Charlotte Brown

Charlotte Brown, an investigator with the Matagorda County Sheriff's Department, testified that she became involved in the case when she received a referral from CPS in July 2007. E.L. was sixteen years old when Brown met her. Brown interviewed E.L. and took her statement. Brown testified that, at the time of the alleged offense, E.L. was twelve years old or younger. Brown testified that E.L. told her of the sexual assault by appellant that occurred in July 2003, the night of E.L.'s grandfather's funeral. On that date, E.L. was twelve years old and appellant was thirty-one years old. Brown confirmed that E.L. told her that appellant was unable to fit his penis all the way into her vagina. Brown also testified that E.L. told her of the sexual contact with appellant in 2005 when appellant and A.L. were living with his parents. During that time, E.L. told Brown that appellant engaged in oral sex and intercourse with her.

On redirect examination, Brown testified that between 2007, when appellant was arrested, and 2011, appellant had fled the jurisdiction.

5

### 4. Jaclyn

Jaclyn testified that she and A.L. are second cousins. Jaclyn began living with appellant in 2000 when she was eighteen and appellant was twenty-eight. Jaclyn's relationship with A.L. was "rocky" because A.L. was involved with appellant both before and after Jaclyn's relationship with appellant.

On the night following the funeral when E.L. spent the night at her home, appellant was "doing his usual smoking and drinking thing." Jaclyn woke up around 2:00 or 3:00 in the morning and found appellant coming back into the house. He said he had been outside smoking a cigarette. Jaclyn did not know about the sexual abuse until she was interviewed by Brown. Jaclyn eventually ended her relationship with appellant around 2004; they were never formally married.

### 5. A.L.

A.L. stated that, in 2007, when she gave a statement to Brown, she was still married to appellant and still living with him. Appellant drove her to the sheriff's department. After she gave the statement, appellant was "kind of hysterical" and "was hitting [her] over the head with his cell phone asking [her] what did [she] say, what did [she] say." A.L. told him she had said that she did not know what was going on. A.L. said she was "scared of [appellant]" and "scared for [herself]." A.L. stated that she had been married to three men—E.L.'s father, David, and appellant—all of whom were cousins of each other. She had a relationship with appellant both before and after his relationship with Jaclyn, who is her cousin. She admitted that the family relationships

6

were "a screwed up situation." She also admitted that she had used drugs and was "a horrible mother." A.L. said that E.L. had never asked her to leave appellant because E.L. knew that A.L. loved appellant. When A.L. confronted appellant about E.L.'s allegations of abuse, he did not deny it, but said that E.L. had "[come] on to him." A.L. did not provide this information to anyone. During the time that appellant was a fugitive from the court, A.L. was not involved with him. Later, when A.L. was in Nebraska, she picked appellant up at the bus station. He was on drugs. He said that he "wasn't the only one" that had assaulted E.L. Appellant was angry and stabbed A.L. in the leg with a knife; she also cut her hand reaching for the knife. A.L. had not been in contact with appellant for about three years but was still married to him. When asked, "Would it be fair to say that back during those times, you would have said anything to the police that he wanted you to?", A.L. said, "Yes, ma'am."

On cross-examination, appellant's counsel asked if A.L. remembered telling Brown that E.L. told her that she had made up the allegations of abuse by appellant. A.L. said she did not remember saying that. A.L. stated that some of what she had said in her statement to Brown was false and explained that she had lied because she was afraid of appellant and was trying to protect herself.

**6. Susan Maxwell**

Susan Maxwell, an investigator with the Matagorda County district attorney's office, testified that appellant was arrested in January 2011. He had been a fugitive since 2008.

## II.    SUFFICIENCY OF THE EVIDENCE

### A.  Standard of Review and Applicable Law

By two issues, appellant argues that: (1) the evidence was insufficient to support his conviction; and (2) because the State failed to prove that his sexual organ penetrated E.L.'s sexual organ, there was a "fatal variance" between the indictment and the evidence presented. We address these issues together.

We review claims of evidentiary insufficiency under "a rigorous and proper application of the *Jackson* standard of review." *Brooks v. State*, 323 S.W.3d 893, 906–07, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under the *Jackson* standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319; *see Brooks*, 323 S.W.3d at 898–99 (characterizing the *Jackson* standard as: "Considering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt."). The fact-finder is the exclusive judge of the credibility of witnesses and of the weight to be given to their testimony. *Anderson v. State*, 322 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)). Reconciliation of conflicts in the evidence is within the fact-finder's exclusive province. *Id.* (citing *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000)). We must resolve any inconsistencies in the testimony in favor of the verdict. *Id.* (citing *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000)).

Sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge, not the charge actually given. *Byrd v. State*, 336 S.W.3d 242, 246 (Tex. Crim. App. 2011); *Malik v. State*, 953 S.W.W2d 234,

8

240 (Tex. Crim. App. 1997). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Byrd*, 336 S.W.3d at 246; *Malik*, 953 S.W.2d at 240. Measuring the sufficiency of the evidence against the hypothetically correct jury charge ensures that a defendant will be acquitted when the State actually fails to meet its burden of proof rather than when the State includes a simple error in the indictment or jury charge. *Malik*, 953 S.W.2d at 240. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404–05 (Tex. Crim. App. 2000).

A variance arises when there is a difference between the allegations in the indictment and the evidence presented at trial. *Gollihar v. State*, 46 S.W.3d 243, 257 (Tex. Crim. App. 2001). An immaterial variance between the indictment and the proof at trial is disregarded in a sufficiency of the evidence review. *Id.* A material variance, however, is fatal if it prejudices the defendant's substantial rights. *Id.* When determining materiality, the court "must determine whether the indictment, as written, informed the defendant of the charge against him sufficiently to allow him to prepare an adequate defense at trial, and whether prosecution under the deficiently drafted indictment would subject the defendant to the risk of being prosecuted later for the same crime." *Id.* A defendant bears the burden of showing prejudice. *Santana v. State*, 59 S.W.3d 187, 194 (Tex. Crim. App. 2001). The court will disregard the variance if the defendant fails to explain how it prevented him from preparing an

adequate defense or how he could be tried again under the same facts. *Hilburn v. State*, 312 S.W.3d 169, 175 (Tex. App.—Fort Worth 2010, no pet.).

### B. Discussion

Appellant argues that the evidence is insufficient because: (1) there was no DNA or other physical evidence; (2) there were no eyewitnesses to the abuse; (3) he denies the allegations; (4) E.L.'s outcry occurred years after the alleged abuse; (5) E.L. recanted the allegations of sexual abuse "to multiple third-parties"; and (6) E.L. lacked credibility because she had been abused before her encounters with appellant, had used drugs, and had assaulted her mother. With regard to the variance claim, appellant argues that the State failed to prove that appellant's penis penetrated E.L.'s vagina because: (1) "the DA never clarified that the Appellant actually used his sex organ to enter [E.L.]" and (2) when E.L. testified that appellant "force[d] himself inside of [her]," she did not specify that she meant his sexual organ.

Appellant's arguments are without merit. The amended indictment stated that appellant "on or about the 13th day of July, A.D. 2003 . . . did then and there, intentionally or knowingly cause the contact and penetration of the sexual organ of [E.L.], a child who was then and there younger than 14 years of age and not the spouse of the defendant, by defendant's sexual organ." Under a hypothetically correct jury charge, the State was required to prove beyond a reasonable doubt that appellant (1) intentionally or knowingly (2) penetrated E.L.'s sexual organ with his sexual organ and (3) E.L. was then younger than 14 years of age. *See* TEX. PENAL CODE ANN. §§ 22.021(a)(1)(B)(i), (2)(B).

It is well settled law that the testimony of a child sexual abuse victim alone is

10

sufficient to support a conviction. *See* TEX.CODE CRIM. PROC. ANN. art. 38.07 (West Supp. 2011); *Martinez v. State*, 178 S.W.3d 806, 814 (Tex. Crim. App.2005); *Hiatt v. State*, 319 S.W.3d 115, 121 (Tex. App.—San Antonio 2010, pet. ref'd). "[T]he prosecution is not required to introduce any medical reports or other physical evidence to corroborate a child victim's testimony during trial." *Hiatt*, 319 S.W.3d at 121.

E.L. testified that on July 14, 2003, when she was twelve years old, appellant pulled down her pants and "tried to force himself inside" her. E.L. stated that appellant was not able to fully penetrate her, but that he did partially penetrate her. She also testified that the July 2003 incident with appellant was the first time she had "intercourse" and that after the incident, she saw blood on her panties.

The court of criminal appeals has stated that:

> penetration occurs when there is "tactile contact beneath the fold of complainant's external genitalia," and that it is not inaccurate "to describe [conduct] as a penetration, so long as [the] contact with [the complainant's] anatomy could reasonably be regarded by ordinary English speakers as more intrusive than contact with her outer vaginal lips." In *Vernon*, the defendant was charged with and convicted of aggravated sexual assault of his thirteen-year-old step-daughter. The Second Court of Appeals affirmed the defendant's conviction, in spite of testimony by the complainant that the defendant had only touched the "outside" of her vaginal area. In affirming the court of appeals, this Court noted that the statute does not criminalize penetration of the vagina, but the broader conduct of "penetration of the . . . sexual organ" of the child. We went further to say that "pushing aside and reaching beneath a natural fold of skin into an area of the body not usually exposed to view, even in nakedness, is a significant intrusion beyond mere external contact[,]" and therefore constitutes penetration in the context of sexual assault.

*Cornet v. State*, 359 S.W.3d 217, 226 (Tex. Crim. App. 2012) (internal citations and quotations omitted); *see Vernon v. State*, 841 S.W.2d 407, 409 (Tex. Crim. App. 1992).

The section of appellant's brief discussing the sufficiency of the evidence contains the following sentence: "There was an extremely delayed outcry, in

11

conjunction with numerous denials of sexual abuse, and recantations of said sexual abuse by [E.L.] to multiple third-parties (Testimony at Motion for New Trial hearing)." No other citation to the record is provided. We have searched the record of the hearing on appellant's motion for new trial in vain for any support for this statement. At the hearing, appellant's counsel introduced E.L.'s admission records to Shoreline, which included Defense Exhibits 1 and 3. Defense Exhibit 1 includes the question: "Describe any history of sexual or physical abuse that would place the client at greater psychological risk during a restraint[,]" followed by the hand-written notation, "denies." Defense Exhibit 3 contains the question, "[h]ave you ever been forced to have sex against your will?" The box marked "no" is checked. Both forms are dated "8/31/06," the date of E.L.'s admission to Shoreline. At the hearing, on cross-examination of one of appellant's lawyers, the prosecutor made the point:

| Q [by prosecutor]: | Do you recall that it was sometime after she— [E.L.] had been at Shoreline that [E.L.] finally outcried about any sexual abuse? |
|---|---|
| A [appellant's counsel]: | Yes. I think that—yes, I do remember that was—that did come out that way. |
| Q: | So, it's not surprising when you look at these documents that up until that outcry, there was denial of any abuse by [E.L.]? |
| A: | That seems to be a logical way to look at it. |

Apparently, these are the "numerous denials of sexual abuse" referenced in appellant's brief.

With regard to the "recantations of said sexual abuse by [E.L]," we have found no recantation *by E.L.* We assume that counsel may be referring to A.L.'s July 18, 2007 witness statement, in which she told investigators that E.L. said she had "made up the

12

story" about appellant and that E.L. had told her grandmother (A.L.'s mother) that she had lied. However, as noted above, A.L. testified emphatically at trial that she lied in making that statement. On cross-examination by appellant's counsel, A.L. was specifically asked about the statement that "[E.L. said] that she had made up the story about [appellant]." A.L. responded, "I made that statement, and that's a lie." She clarified, "I'm saying I wrote this statement out of fear. Half of it or more than half of it is not true." Therefore, A.L.'s statements in her witness statement—that she disavowed at trial as "lies"—cannot reasonably be characterized as "recantations of said sexual abuse by E.L," as stated in appellant's brief. Accordingly, we find that the statement in appellant's brief is misleading and misrepresents the record.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that E.L.'s testimony was legally sufficient for a rational fact finder to find that appellant's sexual organ penetrated her sexual organ. The jury, as the trier of fact, was free to draw reasonable inferences from E.L.'s testimony. *See Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007) (stating the jury, as the trier of fact, may draw reasonable inferences from the facts). It is the exclusive province of the jury to reconcile conflicts in the evidence. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000).

With respect to appellant's variance claim, we also conclude that, because the jury could reasonably infer from E.L.'s testimony that appellant's penis penetrated her sexual organ, there was no difference between the allegations in the indictment and the evidence presented at trial. *See Gollihar*, 46 S.W.3d at 257. We overrule appellant's first and second issues.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

13

By his third issue, appellant contends he was denied effective assistance of counsel. By four sub-issues, appellant contends his counsel was ineffective by: (1) failing to investigate impeachment information; (2) failing to investigate and present an adequate case at the punishment phase; (3) failing to strike a jury member who knew and worked with one of the State's witnesses; and (4) failing to object or request limiting instructions to inadmissible testimony.[5]

## A.    Standard of Review

We review the denial of a motion for new trial under an abuse of discretion standard. *See Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004), *superseded in part on other grounds by* TEX. R. APP. P. 21.8(b); *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995); *Cueva v. State*, 339 S.W.3d 839, 857 (Tex. App.— Corpus Christi 2011, pet. ref'd); *Shanklin v. State*, 190 S .W.3d 154, 158 (Tex. App.— Houston [1st Dist.] 2005), *pet. dism'd*, 211 S.W.3d 315 (Tex. Crim. App. 2007); *State v. Gill*, 967 S.W.2d 540, 542 (Tex. App.—Austin 1998, pet. ref'd). A trial court abuses its discretion by denying a motion for new trial only when its decision is arbitrary or unreasonable, or when no reasonable view of the record could support the trial court's ruling. *Charles*, 146 S.W.3d at 208; *Cueva*, 339 S.W.3d at 857; *Escobar v. State*, 227 S.W.3d 123, 126 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). The ruling of the trial court is presumed to be correct, and it is the appellant's burden to establish the contrary. *Jensen v. State*, 66 S.W.3d 528, 545 (Tex. App.—Houston [14th Dist.] 2002,

---

[5] We note that in his motion for new trial, appellant complained of: (1) trial counsel's failure to strike the jury member (the foreperson of the jury) who knew one of the State's witnesses; (2) the trial court's denial of his motion for continuance on the day of voir dire; and (3) the State's untimely production of E.L.'s records from Shoreline and counsel's failure to adequately investigate the records. At the motion for new trial hearing, appellant's counsel complained of trial counsel's failure to: (1) move for a continuance on the day of trial; (2) investigate at the guilt/innocence and punishment phases of trial; and (3) strike the jury foreperson.

pet. ref'd); *State v. Read*, 965 S.W.2d 74, 77 (Tex. App.—Austin 1998, no pet.). The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles, and "the mere fact that a trial court may decide a matter within its discretionary authority differently than an appellate court does not demonstrate such an abuse." *State v. Herndon*, 215 S.W.3d 901, 907–08 (Tex. Crim. App. 2007) (quoting *Howell v. State*, 175 S.W.3d 786, 792 (Tex. Crim. App. 2005)). We do not substitute our judgment for that of the trial court. *Charles*, 146 S.W.3d at 208.

## B.    Applicable Law

"To obtain a reversal of a conviction under the *Strickland* test, a defendant must show that:    (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding." *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "[E]ach case must be judged on its own unique facts." *Davis*, 278 S.W.3d at 353.

15

The burden is on appellant to prove ineffective assistance of counsel by a preponderance of the evidence. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Appellant must overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance and that his actions could be considered sound trial strategy. *See Strickland*, 466 U.S. at 689; *Jaynes v. State*, 216 S.W.3d 839, 851 (Tex. App.—Corpus Christi 2006, no pet.). A reviewing court will not second-guess legitimate tactical decisions made by trial counsel. *State v. Morales*, 253 S.W.3d 686, 696 (Tex. Crim. App. 2008) ("[U]nless there is a record sufficient to demonstrate that counsel's conduct was not the product of a strategic or tactical decision, a reviewing court should presume that trial counsel's performance was constitutionally adequate . . . ."). Counsel's effectiveness is judged by the totality of the representation, not by isolated acts or omissions. *Thompson*, 9 S.W.3d at 813; *Jaynes*, 216 S.W.3d at 851. An allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002); *Thompson*, 9 S.W.3d at 814 n.6.

## C.    Discussion

### i.    Failure to Investigate Impeachment Evidence

By his first issue, appellant complains that his counsel was ineffective for failing to adequately investigate E.L.'s records at Shoreline.[6] Appellant argues that although his trial counsel had access to the State's file, they failed to investigate E.L's records at Shoreline. Those documents include her admission records, in which she denied

---

[6] We note that appellant had two trial counsel: Bill Leathers and William Orr. Both testified at the hearing on appellant's motion for new trial. Leathers testified that he was hired as co-counsel to help Orr. Leathers was not present for voir dire because he was engaged in another trial. Leathers first saw E.L.'s records from Shoreline the first day of trial.

16

having suffered sexual abuse, documentation of her drug and alcohol use, her juvenile justice records documenting several assault charges, and A.L.'s 2007 witness statement, in which she said that E.L. told her and E.L.'s grandmother that she made up the allegations of abuse by appellant.

One of appellant's trial attorneys, Bill Leathers, testified that he handled the cross-examination of E.L. during trial, and in preparation, had reviewed E.L.'s Shoreline records. On the first day of trial, Orr gave him E.L.'s records, which consisted of a file approximately "3 ½ to 4 inches thick, a bunch of stuff, a lot of paper." Orr had previously gone through the records and marked certain documents of interest. Leathers testified he did not specifically recall looking at E.L.'s admission records which reflected her denial of having suffered sexual abuse. Leathers stated that having the form reflecting E.L.'s denial of sexual abuse "could have been" a "pretty powerful piece of evidence." Leathers did not recall reviewing E.L.'s juvenile record and said that E.L.'s history of assaults "might have had impeachment value." Appellate counsel showed Leathers E.L.'s medical records, which showed she had been pregnant and had a miscarriage. When asked if the information would have been important to impeach E.L.'s credibility, Leathers said it "might have been." Appellate counsel showed Leathers E.L.'s probation records showing that she admitted violating the conditions of her probation. Leathers said it "might have been" useful. Leathers did not recall reviewing E.L.'s drug history and said it would have been useful in impeaching her credibility. Leathers said a ninth grade report showing drug abuse and a high "violence scale" "could have been a dynamite piece of data for the defense." Leathers stated that

17

he did not have these documents available during cross-examination of E.L. and it "[c]ertainly could have" been useful to impeach E.L.'s credibility.

On cross-examination, the prosecutor elicited testimony from Leathers that he had questioned E.L. at trial about her history of drug use and prior sexual behavior. Leathers said that the jury was told about E.L.'s history of drug use, history of juvenile probation, and assaultive behavior toward A.L. As noted above, the prosecutor also elicited testimony from Leathers that it was not surprising that E.L.'s admission documents showed a denial of having suffered sexual abuse because she was at Shoreline for a period of time before she outcried about the sexual abuse. When asked if information regarding E.L.'s violent nature, sexual promiscuity, assaultive behavior and drug usage went to the jury, Leathers said, "I think it probably did." Leathers stated that he was assisting William Orr, appellant's attorney of record. On redirect examination, Leathers said that if he had had E.L.'s records, it would have altered his preparation and cross-examination of E.L.

Orr testified that he was retained to represent appellant. Orr stated that he interviewed appellant several times and talked to other members and friends of appellant's family. He admitted that he did little or no investigation for the punishment phase of trial. Orr stated that he received a CD-ROM containing E.L.'s records from Shoreline on the Thursday before trial started on a Monday. The records consisted of thirteen volumes containing 941 pages of documents. Orr said that there was insufficient time to review all the documents. Leathers was unavailable to review the records because he was engaged in another trial. Orr stated that he filed a motion for continuance on Monday, the first day of trial, but after an off-the record discussion, did

18

not present it to the trial court. Orr stated that he should have presented the motion for continuance to the judge. Orr testified that he "could have" subpoenaed the Shoreline records if he had known "that there was so much in there." Appellate counsel reviewed documents detailing E.L.'s drug use, and Orr said the document "would have helped." Orr stated that the admission record showing E.L. denied a history of sexual abuse "really would have" been beneficial. He stated that, "I believe I knew that she had denied to her mother the offense we were faced with." Orr stated that if he had had the admission form showing that E.L. said she had never been forced to have sex against her will, it "certainly would have" assisted in preparation for cross-examination.

In argument to the court, appellate counsel argued that trial counsel's "series of mistakes" "f[e]ll below the norm of professional representation" and "clearly prejudiced [appellant]." The State argued that all of the topics covered in E.L.'s Shoreline records "were covered during both direct as well as cross-examination during the trial."

The record reflects that all of the topics covered by the records—E.L.'s history of drug use and assaultive behavior, her history of juvenile probation, the fact that she did not tell anyone about the abuse until she had been at Shoreline for a considerable period of time—were covered at trial.

In his brief, appellant asserts, "Trial counsel testified that their failure to conduct pre-trial investigation prejudiced the [a]ppellant, thereby causing harm." The record citation to the motion for new trial hearing reflects no such statement. Appellant asserts that trial counsel's failures were "crucial" because the entire case rested on E.L.'s credibility.

19

E.L.'s credibility was an issue for the jury to decide. Because the impeachment evidence covered by E.L.'s Shoreline records was discussed at trial, appellant cannot show that he was harmed by trial counsel's failure to investigate the records and introduce them at trial. Even if we assume that counsel's performance was defective in failing to utilize E.L.'s records, appellant has not shown that there is any "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *See Ex parte Napper*, 322 S.W.3d at 248 (quoting *Strickland*, 466 U.S. at 694). We overrule appellant's first sub-issue of his third issue.

### ii. Failure to Investigate at Punishment Phase

By his second sub-issue, appellant contends his trial counsel was ineffective for failing to investigate mitigating evidence for the punishment phase of trial. Appellant asserts that counsel failed to interview appellant's family members and did not investigate appellant's history of drug use. According to appellant, "there were clearly many people in [appellant's] family and among his friends who would have come forward or helped the trial counsel prepare a reason for mercy from the jury." Appellant has neither identified any of the "many people" nor explained what testimony they might have offered or how such testimony would have made a difference in the proceedings. An ineffective assistance claim based on counsel's failure to call witnesses fails in the absence of a showing that the witnesses were available to testify and that the defendant would have benefited from their testimony. *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004). We overrule appellant's second sub-issue of his third issue.

### iii. Failure to Strike Jury Member

20

By his third sub-issue, appellant contends his trial counsel was ineffective for failing to strike a venire member who knew and worked with Jaclyn, one of the State's witnesses. The venire member became the jury foreperson.

At the motion for new trial hearing, Orr testified that it was a "mistake" to permit a venire member who knew and worked with Jaclyn to serve on the jury. When asked to explain, Orr stated that when the lawyers were figuring out who to strike, the bailiff relayed that the judge wanted them to finish, and in the rush, "overlooked" striking the venire member who knew Jaclyn. According to appellant, "it is apparent" that he was harmed by the venire member serving as the jury foreperson because appellant received a life sentence and $10,000 fine.

We disagree. Even assuming that counsel's performance was deficient, appellant has not shown that he was harmed by having a co-worker of Jaclyn's serve on the jury. At voir dire, the venire member revealed that he worked with Jaclyn. Defense counsel asked, "Would the fact that you know her and work with the same employer have—affect you in sitting as a juror on this case?" The venire member responded, "No. We work on totally two different shifts." Appellant has not shown that he was harmed by trial counsel's failure to strike the venire member. *See Ex parte Napper*, 322 S.W.3d at 248. There is no other evidence in the record showing that the venire member was biased or otherwise unfit to serve as a juror. We overrule appellant's third sub-issue of his third issue.

### iv.    Failure to Object or Request Limiting Instructions

By his fourth sub-issue, appellant contends his counsel was ineffective by failing to object or request limiting instructions to inadmissible testimony. Specifically,

appellant complains his counsel either did not object or did not request a limiting instruction when: (1) Jaclyn testified that she "got tired of being beat on and raped" by appellant; (2) E.L. testified that appellant was "always riding around, getting high"; and (3) A.L. testified that appellant "didn't deny it [the sexual abuse]."

We first note that appellant did not complain about his counsel's failure to object or request a limiting instruction in his motion for new trial or at the hearing on his motion for new trial. Appellant's appellate counsel did not question his trial counsel at the motion for new trial hearing regarding the failure to object or request a limiting instruction as to the complained-of statements. Thus, the record does not contain any evidence of trial counsel's strategy.

Counsel's isolated failure to object to improper evidence does not necessarily constitute ineffective assistance. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984) (en banc). Because the record here is silent as to trial counsel's strategy, we must presume that counsel's performance was effective. *See Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). Here, we find that the challenged conduct is not so outrageous that no competent attorney would have engaged in it. *See Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (holding that in cases where the record is silent as to the trial counsel's reasoning, the appellate court should find ineffective assistance only if the challenged conduct is so outrageous that no competent attorney would have engaged in it). We overrule appellant's final sub-issue and overrule his third issue.

## IV.    NEW PUNISHMENT HEARING

By his final issue, appellant argues that the trial court erred in denying him a new punishment hearing based on the "gross deviations from reasonable representation and trial strategy that ultimately harmed [him]." According to appellant, "in light of these errors," this Court should remand for a new punishment hearing.

As discussed above, however, appellant has failed to establish that he was harmed by any of the complained-of conduct or its cumulative effect on his trial. We overrule appellant's fourth issue.

## V. CONCLUSION

We affirm the trial court's judgment.

_____
DORI CONTRERAS GARZA,
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
12th day of September, 2013.