**Affirmed as Modified and Opinion Filed March 13, 2014**



**In The**

# Court of Appeals
# Fifth District of Texas at Dallas

**No. 05-12-01693-CR**

**VINICIO JESUS GARCIA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 282nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F11-57569-S**

## MEMORANDUM OPINION

Before Justices Francis, Lang-Miers, and Fillmore
Opinion by Justice Francis

Vinicio Jesus Garcia drove to the home of his business partner, Rene Emerson Gonzalez, after Gonzalez refused to answer his calls. Armed with a .44-caliber revolver, appellant parked in Gonzalez's driveway and fatally shot Gonzalez in his front yard. Gonzalez was not armed. Hours after the shooting, appellant contended the gun accidentally discharged. Later at his trial, he contended both that the shooting was accidental and that he acted in self-defense.

After hearing the evidence, the jury was instructed on self-defense, murder, and manslaughter. Appellant was convicted of murder and assessed a life sentence. On appeal, appellant complains of charge error relating to the self-defense instruction, insufficiency of the evidence to support his conviction and court costs, and admission of certain evidence. He also asserts the judgment should be corrected to reflect the proper prosecuting attorneys. We sustain

the last issue but conclude the remaining issues are without merit. We reform the judgment as requested and, as reformed, affirm the trial court's judgment.

On July 14, 2011, Gonzalez was standing in front of his house with his wife, Eva, and their three children buying ice cream from a street vendor. Eva went into the house with one of the children and heard two or three gunshots. When she went back outside, she saw her husband lying face down on the ground making sounds like he was choking. Appellant, a friend and business associate of her husband's, was standing in the middle of her yard. She realized her husband had been shot and called out to appellant, who she said told her "he lied to him." Appellant got in his car, which was parked in her driveway, and tried to leave. The car would not start, and appellant got out and began pounding on the hood, saying something to the effect of "why did I do it."

Eva then testified to an incident involving appellant that occurred a few days before the shooting. She was in the garage at her home, and the door was closed. Appellant opened the door, startling her, and asked for Gonzalez. When she said he was not home, appellant left. She told Gonzalez about the incident, and he changed the combination lock so that appellant could not open the door. She also testified that a couple of days before the shooting, Gonzalez told her he was upset because appellant was repeatedly calling him. Eva said Gonzalez appeared agitated or upset.

Candida Don, who lived next door, testified she saw Gonzalez buying ice cream for his children on the evening of the shooting. She was inside her house when she heard a gunshot. As she was coming up the hallway to see what had happened, she heard a second gunshot. She estimated nine seconds passed between the two shots. She looked out of her living room window and saw appellant holding a gun. Don watched as appellant threw the gun on the seat of the car and began hitting the hood. She called 911. Once the police arrived, Don went outside

–2–

and saw appellant was lying on the grass next to the car. Don heard the police ask appellant why he did it, and appellant replied "because he lied to me."

Detective Tim Stewart led the investigation into Gonzalez's death. When he arrived at the scene, appellant had been placed under arrest and was seated in the back of a squad car. Appellant was taken to Dallas Police Department headquarters, where he waived his *Miranda* rights and agreed to talk to Stewart about the shooting. The interrogation was recorded, and the DVD was admitted into evidence.

In the interview, appellant told Stewart that Gonzalez owed him money. Earlier in the week, he said he went to Gonzalez's house to get a payment on the loan. He walked into the garage and startled Gonzalez's wife, which upset Gonzalez. He tried calling Gonzalez "probably 70 times" that week, but Gonzalez would not answer his calls. On the day of the incident, he said he called at least fifteen times and then decided to drive to Gonzalez's house. Appellant was "fooling around" with his gun when Gonzalez came around the corner and said, "Don't ever come over." Appellant said Gonzalez "surprised" him and the gun "went off." Appellant said he was outside the car when the shots were fired. Although appellant said Gonzales looked mad as he came around the corner, he did not shoot him for that reason. Rather, he said the gun had a "hair trigger" and "just went off." After the first shot, appellant said he was surprised because Gonzalez "came forward" instead of falling backward. Appellant said people were "everywhere" within seconds of the shooting.

Appellant denied going to Gonzalez's house to shoot him but admitted he was "pissed off." He said his intent was only to "scare him." Appellant was "was going to tell [Gonzalez] to give me my money," but he did not have a chance because the incident "happened real fast." He said he had "just barely gotten out" of his car when the first shot went off. He said he "didn't need a gun to harass him" but was "fooling around" with the gun.

According to appellant, Gonzalez "talked tough" but was not a "tough guy." At one point, he described Gonzalez as "husky" and said he "intimidated" people: "I guess when he came toward me, maybe for a split second, maybe that's what I thought." After the shooting, he said he sat in his car and put the gun back in a box he kept on the front seat. Then he got out and pounded on the car. He said he may have tried to start the car and leave, but the key would not go into the ignition.

Appellant explained to Detective Stewart that all he wanted was Gonzalez to give him a "couple hundred dollars." But, he said, Gonzalez "thought it was a joke" to repay him the money, and it "just got out of hand." Appellant wanted Gonzalez to "be honest" with him and tell him he was going to repay him; instead, Gonzalez "wouldn't say nothing." He said he should not have gone over to Gonzalez's house, but his intention was to tell him, "don't threaten me." He added that Gonzalez had done "that," but he did not take any threat "to heart, because [Gonzalez] didn't seem like that kind of fellow" but was "a big dude." During the interview, appellant repeatedly told Detective Stewart about the numerous calls he made to appellant's cell phone.

Other evidence at trial included appellant's cell phone records, which showed a "bunch of phone contact" from appellant's cell phone to Gonzalez's cell phone on the day of and in the days leading up to the shooting. Almost all of the calls were brief, about thirty seconds. The last call was made about thirty minutes before the shooting.

Evidence also showed that appellant's gun did not have a "hair trigger." April Stowe, a firearms examiner for SWIFS, tested the trigger pull force on appellant's gun, a .44 magnum caliber revolver. She explained that trigger pull is the amount of force necessary to move the trigger so that it will release the hammer and the cartridge will be fired. Appellant's weapon could fire in two different actions, single and double. She said it takes more force to fire in

–4–

double action. Her testing showed that in single action, it took approximately 3.248 to 3.556 pounds to fire appellant's gun; in double action, it took approximately 10.907 to 11.113 pounds. Stowe testified she was familiar with the slang term, "hair trigger," which she said refers to a trigger pull that is "very light." She determined appellant's gun did not have a "hair trigger" when fired in either single or double action; rather, the trigger pull was within the "normal range."

Finally, Dr. Joni McLain, deputy chief medical examiner, testified Gonzalez sustained a gunshot wound that entered the right side of the chest and perforated the heart, liver, stomach, and spleen before exiting the left side of the chest. The bullet then re-entered the left upper arm and exited the left upper arm. McLain said the bullet trajectory was from right to left, slightly downward, and slightly front to back on his body. McLain said stippling around the entrance wound indicated the barrel of the gun was one to three feet away when fired. She agreed the body "would almost have to [have] be[en] perpendicular to the shot." She also agreed that Gonzalez's arm was up or "out" when he was shot because there was stippling on the inside part of his arm. While she could not say what position Gonzalez was in when shot, she did say he was not facing his shooter because the bullet went "straight through on the side." The autopsy report showed Gonzalez was 31 years old, was 5'9, and weighed 263 pounds. Detective Stewart testified appellant was approximately 5'5, weighed about 160 pounds, and was older than Gonzalez.

Appellant testified in his defense. He said he and Gonzalez were friends who went into business together. Gonzalez was a body work mechanic, and appellant believed he did good work. After a couple of months, appellant suggested they go into business together with appellant receiving a percentage of the money derived from business he referred to Gonzalez. Just as the business was starting, appellant said he loaned Gonzalez money. Gonzalez repaid

part of the loan but then stopped taking appellant's calls. To annoy Gonzalez, appellant said he started calling him "all the time." Appellant knew Gonzalez was "not happy" about all of the calls. This continued up until the day of the shooting when appellant said he called Gonzalez "a lot."

Appellant testified he went to Gonzalez's home to end the business relationship and give him back a truck title appellant had taken as security for the loan so Gonzalez "couldn't just say, well, you got my title." Appellant said he took his gun, which he carried with him all of the time because he had previously been attacked in south Dallas. He kept the gun in a box on the front seat. When he arrived at Gonzalez's home, appellant said he was "going through the car" looking for the title and the gun fell out of the box. Appellant said he "had to put it back in" and grabbed a camera and moved it. As he is doing all this, he heard Gonzalez say, "Don't come – don't come over here like that." Appellant then testified:

> And then he says it again, and at that -- and he sounds pretty -- this time he sounds pretty serious, you know, so I'm thinking -- and then I look up and so I push the box, and the gun's there, and I look around and he's running. He's not – he's not walking towards -- and so the door is open.

> The problem is -- now, I'll be honest, I don't remember the sequence of events. This is not something you want to go through. The key breaks, and then he runs and he comes around -- anyway, so when [he] comes to the doorway, I can see he's – he's pretty intense. I have been in several situations where you have to react very quickly to live. But -- so when I see him run down – he runs at -- but he -- so he runs around, because the door's like this (indicating), he runs around like this, and I want to tell him stop. And I – I'm not going to lie, I don't remember the sequence of events. I don't remember if I went -- I tried to get up but I couldn't because when the key broke, the -- because I tried to grab it like this (indicating), the metal part stuck in the ignition, so the steering wheel would not retract.

> So I try to get up like this (indicating) and I fall back, and I don't remember if -- if that's when the first shot goes off, and -- but that's when comes arou -- and he comes around to the door like -- like this, and I don't even have a chance to say, hey -- I don't even have a chance -- you know, I don't know the definition of a hair trigger, but to me it felt like I -- I mean, like, I didn't even -- I didn't even feel like I pulled it, but, you know, it could have been the -- the adrenaline.

–6–

The thing is, he -- he was just rushing me. I mean, you know, he was not there to -- he wasn't there to talk to me. If you ever want to be in a situation, you don't have much time to think. That's why sometimes innocent people die.

Appellant described Gonzalez as "a pretty strong guy" and described himself as "out of shape" and "short" but also as a "healthy guy" who carried a twenty-pound tool kit. He said he believed Gonzalez was going to "pummel" him when he was running toward him. When asked if he was "fearful" at that moment, appellant said he did not like being "pummeled." He explained that he had been "mugged" before and if he had reacted quicker, he would have gotten away. So, he said, "you don't have much time. You don't have a -- you have split seconds to react. If you make the wrong decision, you could wind up in the hospital or dead. You never know at that instance."

Appellant said he was inside his car when the gun went off. He denied getting out of the car with the gun either before or after he shot Gonzalez. He also denied going to Gonzalez's house to kill him or hurt him. He said the events after the shooting were "blurry." He remembered pounding the car, and saying, "It doesn't matter now," when the police officer asked him why he did it.

On cross-examination, he testified he did not have a concealed handgun permit to carry the gun. He said he carried the loaded .44-caliber gun in a FedEx box in his car. He "didn't remember" shooting the gun twice but did remember Gonzalez was "really close." He said he "never got out of the car," so if he shot twice, "it must have happened fairly quickly." He remembered telling the detective that "after the first shot, he kept coming," then adding that Gonzalez was so close he did not "understand how" he missed him and did not "remember if the first or second shot hit him."

When asked if he was claiming Gonzalez threatened him, appellant said that in the days before the shooting, Gonzalez told him, "I'm going to fuck you up." Even so, he went to

Gonzalez's house because Gonzalez had said that once before and did not do anything. He knew Gonzalez was mad at him for "scaring" his wife a few days earlier. He also admitted he told the police he was "pissed" and his intention was to "scare" Gonzalez.

In issues one and two, appellant contends that although the jury was charged on self-defense, the instructions were not complete. Specifically, he argues the trial court erred in omitting instructions regarding the "presumption of reasonableness" and the "lack of a duty to retreat."

The State makes five arguments in response, the first being that appellant was not entitled to any instructions on self-defense and therefore cannot complain of incomplete instructions which benefited him even if incomplete. Because it is dispositive, we first address whether appellant was entitled to a self-defense instruction at all.

We use a two-step process in reviewing jury charge error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). First, we determine whether error exists in the charge; if error did not occur, our analysis ends. *Id*. If error does exist, we review the record to determine whether the error caused sufficient harm to require reversal of the conviction. *Id*. When the defendant fails to object, as is the case here, we will not reverse for jury charge error unless the record shows "egregious harm" to the defendant. *Id*. at 743–44.

A defendant is entitled to an instruction on self-defense if the issue is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the evidence. *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001). On the other hand, if the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue. *Id*. Whether a defense is supported by the evidence is a sufficiency

question reviewable on appeal as a question of law. *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007).

A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a) (West 2011). A person is justified in using deadly force against another if the actor would be justified in using force against another under section 9.31 and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. *Id*. § 9.32(a)(1), (2)(A). Deadly force is "force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id*. § 9.01. A reasonable belief is one held by an ordinary prudent person in the same circumstances as the actor. *Id*. § 1.07(42) (West Supp. 2013).

To be entitled to a self-defense instruction, a defendant is required first to admit the conduct charged in the indictment and then to offer evidence justifying the conduct. *See Jackson v. State*, 110 S.W.3d 626, 631 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). The Texas Court of Criminal Appeals, however, has said that "admitting the conduct" does not always mean admitting the commission of every statutory element of the offense; rather, the defendant must "sufficiently admit to the commission of the offense." *See Martinez v. State*, 775 S.W.2d 645, 647 (Tex. Crim. App. 1989).[1]

In addition, the statute necessarily contemplates that the force used by a defendant must be reasonable as contemplated from the defendant's point of view. *Reed v. State*, 703 S.W.2d

---

[1] In *Martinez,* the defendant admitted to pulling a gun, firing into the air, and having his finger on the trigger when the fatal shot was fired. 775 S.W.2d at 647. But, he denied the element of "intent to kill." *Id.* The Court held he had "sufficiently admit[ted] to the commission of the offense." *Id*. Since then, the court noted it has treated *Martinez* as "little more than a legal anomaly" and has "re-emphasized the applicability of confession and avoidance to self-defense," at least as it related to misdemeanor assault. *Cornet v. State*, 359 S.W.3d 217, 225 (Tex. Crim. App. 2012).

380, 384 (Tex. App.—Dallas 1986, pet. ref'd) (per curiam). The record therefore must contain some evidence of the defendant's state of mind or observable manifestations of the defendant's state of mind at the time of the alleged act of self-defense. *Id.* at 385. And, that evidence must show the defendant was "in some immediate apprehension or fear of being the recipient of the unlawful use of force by the complainant." *Smith v. State*, 676 S.W.2d 584, 585 (Tex. Crim. App. 1984). When the force used is deadly force, as in this case, the defendant must show he believed he was in immediate apprehension or fear that the deceased was about to kill or seriously injure him.

Here, after reviewing the record in the light most favorable to appellant, we cannot conclude appellant was entitled to a self-defense instruction. In an interview with police two hours after the shooting, appellant said he drove to appellant's house with a gun and was "pissed" because appellant owed him money and would not return his phone calls. He pulled into Gonzalez's driveway and was "fooling around" with the gun, which he said had a "hair trigger," when Gonzalez "surprised" him and the gun accidentally discharged. Appellant said he "had just barely gotten out" of his car when the first shot "went off."

At trial, appellant essentially continued with that version. He testified he was seated in his car, rummaging through items in the front seat, when the gun fell out of the box. As he was moving things around, appellant heard appellant tell him not to come to his home. Appellant said he looked up and saw Gonzalez "running" toward the car. Gonzalez came around to the door, and appellant said he tried to get out of the car, but fell back could not remember "if that's when the first shot goes off." He said he did not feel like he pulled the trigger, although it "could have been the . . . adrenaline." As in his statement to the police, he suggested the gun had a "hair trigger." But, during cross-examination, the State asked whether he pulled the trigger, and

–10–

appellant said yes. Assuming appellant admitted the conduct by this testimony, there is no evidence showing that appellant feared for his safety.

At most, the evidence showed Gonzalez did nothing more than "rush" or "run" at appellant while telling him in a "pretty serious" voice not to come to his home. Appellant shot Gonzalez from one to three feet away. Gonzalez was not armed, and there is no evidence he made any verbal threat. Although there was evidence that Gonzalez was younger and larger, there was no evidence in the record that appellant was ever afraid of Gonzalez because of prior dealings. In fact, appellant told Detective Stewart Gonzalez "talked tough" but was not a "tough guy." And while he said Gonzalez had threatened him before, he also said he did not take the threat "to heart" because Gonzalez "didn't seem like that kind of fellow."

At no time did appellant ever testify that he was "in some immediate apprehension or fear" that appellant was about to kill him or seriously injure him or testify to any facts that would lead to a reasonable belief that he was in fear. Even when given the direct opportunity to say so, appellant did not. When appellant testified he believed Gonzalez was "there to pummel" him, defense counsel asked, "You were fearful at that moment?" Instead of providing a direct answer, appellant responded, "I don't like being pummeled," recounted previous instances in his life when he had been beaten up, and noted that a person has only "split seconds" to react and could "wind up in the hospital or dead" if he makes the "wrong decision."

Considering the record, we conclude self-defense was not raised by the evidence and the charge should not have included any instructions on the issue at all. Consequently, there is no error in failing to provide the two instructions of which appellant now complains. We overrule the first and second issues.

In his third issue, appellant contends the trial court abused its discretion by allowing testimony concerning whether, during the encounter with Gonzalez, appellant violated the statute

–11–

prohibiting unlawfully carrying a weapon, section 46.02 of the penal code. He argues the "timing and methodology" confused the jury, and the trial court should have excluded the testimony "at least until a time in the trial after [a]ppellant had raised self-defense."

During the State's case in chief, after Detective Stewart testified about appellant's statement regarding the shooting, the prosecutor began to ask questions regarding the offense of unlawfully carrying a weapon. Defense counsel generally objected. In a discussion outside the presence of the jury, the prosecutor indicated she wanted to show appellant violated the prohibition against unlawfully carrying a weapon, which was relevant to self-defense if appellant later requested it in the charge. The trial judge responded that the questions were "not timely" because the evidence did not raise self-defense. In response to the judge's question, defense counsel said he believed self-defense had been raised and then objected only on the basis that the detective was being asked for a legal conclusion on the issue of whether appellant violated section 46.02. The trial court overruled the objection.

The complaint on appeal must comport with the complaint made in the trial court or the error is forfeited. *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). That is, the complaint must be "essentially the same." On appeal, appellant does not address the only issue raised below – whether the trial court abused its discretion in allowing the detective to testify to a "legal conclusion." Because his complaint on appeal does not comport with the only objection below, we overrule the third issue.

In his fourth issue, appellant contends the evidence is insufficient to support his conviction for murder because the State failed to prove he had the requisite intent to commit murder. He argues he was only "reckless" with respect to handling the gun, and there was no evidence that he deliberately shot Gonzalez or intended to shoot him. He therefore argues the

judgment should be reformed to reflect a conviction for manslaughter and the cause remanded for a new punishment hearing.

In assessing the sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 309 (1979). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Blackman v. State*, 350 S.W.3d 588, 595 (Tex. Crim. App. 2011). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Rather, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Sorrells v. State*, 343 S.W.3d 152, 155 (Tex. Crim. App. 2011). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and the standard is the same for direct and circumstantial evidence cases. *Isassi*, 330 S.W.3d at 638; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).

In this case, the mens rea element of the offense of murder – as charged in the indictment – required proof that appellant intentionally or knowingly caused the death of Gonzalez by shooting him with a firearm or that appellant intended to cause serious bodily injury to Gonzales and committed an act clearly dangerous to human life, shooting Gonzalez with a firearm, that caused Gonzalez's death. *See* TEX. PENAL CODE ANN. § 19.02(b)(1),(2) (West 2011). Murder is a "result of conduct" offense, which requires that the culpable mental state relate to the result of the conduct – causing the death. *Id*. The requisite element of intent may be inferred from acts, words, and conduct of the accused. *Hernandez v.* State, 819 S.W.2d 806, 810 (Tex. Crim. App.

1991). The specific intent to kill may be inferred from the use of a deadly weapon. *Cavazos v. State*, 382 S.W.3d 377, 384 (Tex. Crim. App. 2012). Also, while motive is not an element of the offense of murder, it may be circumstantial evidence of intent. *See Guevara v. State,* 152 S.W.3d 45, 50 (Tex. Crim. App. 2004).

Within this issue, appellant relies on his claims that the shooting was an accident and that he denied any intent to harm Gonzalez, much less kill him. He argues the evidence showed the gun "just went off" when Gonzalez "came charging up to him" and that the weapon had a "hair trigger."

The medical examiner testified Gonzalez died of a single gunshot wound to the side of his chest and left arm. Forensic testing showed Gonzalez was one to three feet from the barrel of the gun when shot and, according to the medical examiner, was not facing appellant. Rather, given the entrance wound, Gonzalez's side was to appellant. The trajectory of the bullet was slightly downward, which casts doubt on appellant's story that he was sitting in the car at the time the gun when "went off." As for the claim that his gun just "went off" because it had a "hair trigger," a firearms expert testified to the contrary. She tested appellant's gun and said it was within the "normal range" and did not have a "hair trigger." Moreover, a neighbor testified she heard two shots, fired nine seconds apart.

In addition to the forensic and medical examiner testimony, appellant admitted he was "pissed" at Gonzalez because he owed him money and Gonzalez would not answer his calls, which suggest a motive in the case. When he drove to Gonzalez's home, he was armed with a gun. Immediately after the shooting, he told Gonzalez's wife that Gonzalez "lied" to him. Similarly, the next door neighbor heard appellant give the same explanation to the police when they asked why he did it. Although appellant testified he did not intend to hurt appellant, the jury was not required to believe him or his explanation for how the shooting occurred. Given the

–14–

evidence in the case, we conclude it is sufficient to show appellant had the intent to commit murder. We overrule the fourth issue.

In his fifth issue, he asserts the judgment should be corrected to reflect the proper State's attorneys at trial. This Court has the authority to correct a judgment of the court below to make the record "speak the truth" when when we have the necessary data and information to do so. *Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd).

Here, the judgment lists the attorney for the state as Melinda Edwards. The reporter's record, however, reflects the attorneys for the state were Melinda Lehman and Marc Moffitt. We therefore modify the trial court's judgment to reflect Melinda Lehman and Marc Moffitt as attorneys for the State.

In his sixth issue, appellant contends there is insufficient evidence in the record to support the trial court's judgment that he pay $244 in court costs because the clerk's record does not contain a bill of costs. The record before us contains a bill of costs. Appellant's complaints have been previously addressed and rejected. *See Johnson v. State*, No. PD-0193-13, 2014 WL 714736, at *4–8 (Tex. Crim. App. Feb. 26, 2014); *Coronel v. State*, 416 S.W.3d 550, 555–56 (Tex. App.—Dallas 2013, pet. ref'd). We overrule appellant's sixth issue.

We modify the trial court's judgment to reflect the proper State's attorneys and affirm as modified.

Do Not Publish
TEX. R. APP. P. 47
121693F.U05

/Molly Francis/
_____
MOLLY FRANCIS
JUSTICE

–15–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

VINICIO JESUS GARCIA, Appellant

No. 05-12-01693-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 282nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F11-57569-S.
Opinion delivered by Justice Francis;
Justices Lang-Miers and Fillmore
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

To reflect the Attorneys for the State as Melinda Lehman and Marc Moffitt.

As **MODIFIED**, the judgment is **AFFIRMED**.

Judgment entered March 13, 2014

/Molly Francis/
MOLLY FRANCIS
JUSTICE