# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00761-CR

---

**Miguel Velasco-Herrera, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 426TH DISTRICT COURT OF BELL COUNTY
### NO. 21DCR84513, THE HONORABLE STEVEN J. DUSKIE, JUDGE PRESIDING

---

### M E M O R A N D U M   O P I N I O N

A jury found Miguel Velasco-Herrera guilty of sexual assault of a child, namely, his stepdaughter, Jane,[1] and the trial court sentenced him to six years' imprisonment in accordance with the jury's verdict. *See* Tex. Penal Code § 22.011. By a single issue, Velasco-Herrera contends that the evidence was insufficient to support his conviction. We affirm.

---

[1] To protect the complainant's identity, we refer to her using a pseudonym. *See* Tex. Const. art. I, § 30(a)(1) (providing that a crime victim has "the right to be treated . . . with respect for the victim's dignity and privacy throughout the criminal justice process"); Tex. R. App. P. 9.10(a)(3) (defining "sensitive data" to include "the name of any person who was a minor at the time the offense was committed"), (b) (providing that court filings in criminal appeals "must not contain sensitive data").

# I.     BACKGROUND

On September 8, 2021, a grand jury indicted Velasco-Herrera for the above-referenced offense. The indictment alleged that, on or about July 5, 2021, Velasco-Herrera "did then and there intentionally and knowingly cause the penetration of the mouth of [Jane], a child who was then . . . younger than 17 years of age, by the defendant's sexual organ."

Trial commenced on October 28, 2024. A 911 call from July 5, 2021 was admitted into evidence. At the beginning of the call, Jane, who was fifteen years old at the time, states, "My stepfather just raped me."[2]

At the time, Velasco-Herrera was employed as a police officer with the Killeen Police Department (KPD). Shawn Dejournett, a lieutenant for KPD, testified that he was familiar with Velasco-Herrera, as Lieutenant Dejournett was Velasco-Herrera's immediate supervisor at the time. On July 5, 2021, Lieutenant Dejournett "received a message that there was a call for service from Officer Velasco's residence from his 15 year-old daughter. That she was alleging he had sexually assaulted her to the 911 dispatch." Lieutenant Dejournett knew that Velasco-Herrera had access to firearms, and so he came up with a ruse "to get him to come out unguarded" from the home. Lieutenant Dejournett called Velasco-Herrera on his cell phone and asked him to come outside to see if he could help officers identify a suspect from a recent burglary in the area. Once Velasco-Herrera exited the home, Lieutenant Dejournett conducted a pat-down and entreated him to move to the side of the home "to keep him from being able to retreat back into the house." Lieutenant Dejournett testified that he "could hear yelling inside the house as" he was talking to Velasco-Herrera.

---

[2] Several audio and video exhibits were admitted into evidence. We have transcribed portions of them to the extent necessary to resolve this appeal.

Video footage obtained from Dejournett's body-worn camera was admitted into evidence. In the video, after meeting with his fellow officers, Velasco-Herrera accompanied them to his front door. When the door opened, both Jane and Jane's mother are observed standing in the entryway of the home, arguing.

Jane's mother stated, while looking at Velasco-Herrera, "I want to know what happened," and, "She's saying you did something." Velasco-Herrera replied, "I didn't do nothing." He then asked, "When? When?" Jane responded, "I'm not lying, you did it while [indecipherable], but I wasn't asleep." Jane's mother then stated, "J[ane], you need to stop lying." Jane again protested, "I'm not lying." Another officer then entered the residence and stepped in between Jane and Jane's mother. Jane's mother shook her head and stated, "This is bullshit."

After Jane's mother and Jane separate, Lieutenant Dejournett spoke briefly with Jane, who relayed, "My stepfather raped me while he thought I was asleep." Lieutenant Dejournett asked when the assault occurred, and Jane responded, "Maybe around—as early as 4:30 . . . this morning."

Lieutenant Dejournett testified that Jane's mother "was making statements that she did not want to be around either party," meaning Velasco-Herrera and Jane. Lieutenant Dejournett further testified, "After meeting with the officers on scene and hearing [Jane's mother]'s response, I knew [Jane's mother] would not take [Jane] to the hospital for the exam which is typical. Typically, the parent would take the child and we would follow on." Lieutenant Dejournett explained that because Jane's mother "did not" want to accompany Jane to the hospital, one of the officers on the scene escorted Jane and Jane's older sister to the hospital.

Elizabeth Gault Weikel, a nurse practitioner and certified Sexual Assault Nurse Examiner (SANE), testified that she conducted a SANE exam on Jane on the morning of July 5, 2021. Medical records from this SANE exam were admitted into evidence.

Weikel read the narrative of the incident that Jane relayed to her into the record:

It started off pretty late maybe like 2 a.m.. We got back inside maybe 3 a.m.. I was first in the kitchen and my step-dad came up to me and kept saying are you drunk. Are you drunk, are you drunk like over and over again, then started touching me in certain places. Patient touches both upper arms at the same time crossing arms over chest. Can you feel this, can you feel this over and over again.

I could tell he was trying to get to my clitoris but then he said go get in the shower. I went in the shower and I was sitting there thinking about what I just experienced—tears filled patient's eyes—and what my step-dad had done.

. . . .

He comes back up and then he started doing the same thing in the shower but I am completely naked, saying can you feel this are you drunk. Then that's when he told me to get out the shower. He wouldn't let me dry off with my towel or anything. He told me to get back on my bed. That's when he started to touch me more down there.

Then from then on he went back down stairs and come back. And back down and back up and do the same thing and touch me down there. He did that a few times. You know he had things to do and help mom cause he was in charge of getting my sister a towel to keep her warm. So I think that's why he kept going down so no one would know what was going on. He came up one last time, that's when he started licking on my chest area. I believe he started licking me vaginally in my coochie.

Then he started rubbing his thing over me, then he put it in my mouth a few times. Then he would go from my mouth to down there and from my mouth to down there. After that he just stopped and left me there naked in my bed. It was probably like 5:30 am.

4

Weikel testified that she asked Jane a series of clarifying questions. Jane reported to Weikel that while she was in the shower, Velasco-Herrera touched her "vagina" on "[t]he inside," and "he also kept asking [her] if [she] liked it." Jane also clarified that by "going from my mouth to my vagina," she meant that Velasco-Herrera "kept putting his penis rubbing against [her] vagina then putting it in [her] mouth."

Weikel testified that she observed several injuries during the physical examination of Jane's person. Specifically, she "observed an irregular shaped red bruise that was painful to touch" and a "laceration" on Jane's genitalia. Weikel testified that these injuries were consistent with Jane's account. Weikel also testified that she collected several DNA swabs from Jane's person. Joseph Andrew Lopez, a forensic scientist for the Department of Public Safety (DPS), testified that the DNA results from the swabs taken from Jane's left breast contained a mixture of two individuals and that it was 10.1 sextillion times more likely that the DNA profile came from Jane and Velasco-Herrera than that the profile came from Jane and an unknown, unrelated individual. Similarly, a swab from Jane's right breast was 9.65 sextillion times more likely to be from Jane and Velasco-Herrera than from an unknown, unrelated individual.

Amanda Holtzclaw, a detective in the special victim unit of KPD, testified about three interviews that were conducted with Velasco-Herrera. These interviews were conducted on July 5, 7, and 13, 2021, and videos of the interviews were admitted into evidence. During the July 5 interview, Velasco-Herrera generally denied that he engaged in any sexual activity. In the July 7 interview, Detective Holtzclaw informed Velasco-Herrera that Jane stated that Velasco-Herrera's penis penetrated her mouth. In response, Velasco-Herrera queried, "Why didn't she bite me?" He further stated, "Obviously, she remembers more than I remember."

5

The July 13, 2021 interview is approximately four hours long and was conducted by Texas DPS Special Agent Joel Machost. In the interview, Velasco-Herrera recounted that after putting Jane to bed, Jane grabbed his penis and put it in her mouth. Velasco-Herrera further relayed that after this, he repositioned Jane on the bed. Special Agent Machost asked Velasco-Herrera whether his penis touched Jane's vagina at this time, and Velasco-Herrera responded, "I guess." He later clarified that he fell on top of Jane and his penis made contact with her vagina. As the interview continued, Velasco-Herrera explained that he taught Jane to fight anyone who tried to molest her and that if she would have tried to fight him, he would have stopped. At the conclusion of the interview, Velasco-Herrera agreed to write a letter to his family. The letter was admitted into evidence and read, in part,

> To my beautiful letter [sic], and especially J[ane,]
>
> I'm sitting here writ[]ing this letter, lost and heart[]broken but I feel like I need to do this.
>
> I want you all to know that I'm very sorry for what happened on the morning of July 5th. I want to apologize because of the mistake that was made that night now our lives have change[d] forever. I hope you all can believe me that I'm not that person and that was never my intention to hurt anyone[.] I can say sorry many times but it will not change the outcome of that night. I just want you all to know that I love you all with all of my heart and hopefully one day you all can forgive me.
>
> J[ane] I want to tell you that I'm very sorry for what happen[ed] that night, there is no excuse, but I want you to know that I never had the intention to hurt you. I always saw you as my beautiful daughter, even though we used to disagree in many way[s], you was [sic] always my daughter. I wish I could change things and take all the bad back, but I can't girl. I just want you to know that it's killing me[,] and I coul[d]n't protect you. I wish I could tell you in person so you could see it in my face how much I regret that morning. I[']m sorry J[ane], I'm very sorry and I hope someday you could find the strength to forgive me.

6

. . . .

> [To Jane's mother,] I'm sorry I failed you, I could protect the [illegible] like I promised. I just want you to know that none of this is your fault. I want you to know that I never mea[n]t to hurt anyone. [L]ike you said the Devil was left inside the hou[s]e that morning and unfortunately destroyed our family.

Esmarelda Simms, a Child Protective Services (CPS) investigator, testified that she met with Jane and Jane's mother in July 2021. At that time, Simms explained that Jane's mother felt "torn on everything that was going on." Simms came up with a safety plan that required Jane's mother to refrain from allowing Velasco-Herrera into the family's home.

However, Simms testified that in September 2021, CPS became involved again, as Jane's mother "was trying to get the protective order lifted to try to get Mr. Velasco back in the home." According to Simms, at that time, Jane's mother "made it clear, that she wanted J[ane] out of the house and [Velasco-Herrera] back into the house." CPS investigators spoke with Jane, who recanted her outcry. Simms testified that there were concerns about this repudiation, as "there was a big shift in family dynamic." Jane's mother "was unemployed" and "there was that financial stress of her not having employment and steady income of up-keeping their lifestyle." According to Simms, Velasco-Herrera had previously been the family's sole source of income.

During her testimony, Jane denied being sexually assaulted by Velasco-Herrera. Jane testified that she first recanted her outcry to her older sister "in the beginning of the school year" in 2021. She testified that she again recanted when CPS came to her school to interview her in September 2021, and that she recanted a third time in an email she wrote to law enforcement in December 2023. Jane further testified that she had not lived in her mother's

7

home since she was either sixteen or seventeen, but that moving out was her choice, as she did not like following her mother's "rules."

The jury found Velasco-Herrera guilty of sexual assault of a child and sentenced him to six years' imprisonment. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

By his sole issue on appeal, Velasco-Herrera argues that the evidence was legally and factually[3] insufficient to sustain his conviction.

### A. Standard of Review & Applicable Law

"The sufficiency of the evidence is measured by comparing the evidence produced at trial to 'the essential elements of the offense as defined by the hypothetically correct jury charge.'" *Metcalf v. State*, 597 S.W.3d 847, 856 (Tex. Crim. App. 2020) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The hypothetically correct jury charge is one that at least 'accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Johnson v. State*, 364 S.W.3d 292, 294 (Tex. Crim. App. 2012) (quoting *Malik*, 953 S.W.2d at 240).

---

[3] *Brooks v. State*, 323 S.W.3d 893, 910 (Tex. Crim. App. 2010) (plurality op.) generally abolished the factual-sufficiency review as it applies to criminal convictions. *See Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015). We now solely assess criminal convictions for the legally sufficiency of the evidence to support the factfinder's verdict. *Id.* Accordingly, to the extent Velasco-Herrera argues the evidence was factually insufficient to support his conviction, we overrule this issue.

When reviewing the sufficiency of the evidence to support a criminal conviction, "courts consider the evidence in the light most favorable to the verdict and determine whether, based on the evidence and reasonable inferences therefrom, a rational juror could have found that the State has proven the essential elements of the crime beyond a reasonable doubt." *Baltimore v. State*, 689 S.W.3d 331, 341 (Tex. Crim. App. 2024). In our sufficiency review, "[d]irect and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Additionally, "[t]he jury is the sole judge of the credibility of a witness's testimony and the weight to assign to that testimony." *Metcalf*, 597 S.W.3d at 855. "That means the jury can believe all, some, or none of a witness's testimony." *Id.*

## B.     Analysis

A hypothetically correct jury charge as authorized by the indictment in this case would permit the jury to find Velasco-Herrera guilty of sexual assault if the evidence sufficiently showed that he:  (1) intentionally or knowingly; (2) caused the penetration of Jane's mouth; (3) with his sexual organ; and (4) at a time when Jane was younger than seventeen.  *See* Tex. Penal Code § 22.011(a)(2)(B).

Velasco-Herrera asserts that he "is not unaware that it is well established that the uncorroborated testimony of a child victim alone can be sufficient to support a conviction of a sexual offense against a child." *See, e.g.*, Tex. Code Crim. Proc. art. 38.07(a), (b)(1). Nevertheless, he argues that "only a mere modicum of evidence was adduced at trial concerning

9

the element of penetration of the victim's mouth and even that was undermined by [Jane's] complete recantation." *See Jackson v. Virginia*, 443 U.S. 307, 320 (1979) ("[I]t could not seriously be argued that . . . a 'modicum' of evidence could by itself rationally support a conviction beyond a reasonable doubt."). We disagree.

During the July 13, 2021 interview, Velasco-Herrera stated that Jane grabbed his penis and put it in her mouth. Velasco-Herrera argues that this statement does not "implicate him as the perpetrator of the offense charged." He contends that any incriminating statements made during the interrogations were merely "desperate attempts to please his interrogators by telling them what they wanted to hear." While this may be one way to view the evidence, it is not the only way. The jury was also permitted to view the statement that Jane grabbed Velasco-Herrera's penis and put it in her mouth as an admission of guilt, especially in light of Velasco-Herrera's frequent attempts to blame the events of the evening on Jane's failure to fight him off. *Cf. Cornet v. State*, 359 S.W.3d 217, 227 (Tex. Crim. App. 2012) (jury could view defendant's statement that he touched child's sexual organ as admission of guilt, despite defendant's qualifier that doing so was solely for medical treatment).

And, in any event, Jane relayed to the SANE examiner that Velasco-Herrera penetrated her mouth with his penis when he thought she was sleeping. She also told law enforcement officers multiple times that her "stepfather raped" her. A child victim's outcry statement alone is sufficient to sustain a conviction for sexual assault. *See Rodriguez v. State*, 819 S.W.2d 871, 874 (Tex. Crim. App. 1991). Citing no authority, Velasco-Herrera argues that "[t]he sworn testimony of the party who made hearsay statements to a sexual assault nurse examiner should carry at least as much probative value as those original, unsworn statements." However, the jury is entitled to assign credibility and weight determinations to the

10

evidence as it chooses, and we may not usurp the jury's role as factfinder. *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018).

Almost immediately after Jane outcried and despite her protestations that she was being truthful, Jane's mother told her to "stop lying." While the investigation was still underway, and after Velasco-Herrera admitted to having sexual contact with Jane, Jane's mother contacted Detective Holtzclaw and requested that she be permitted to have contact with Velasco-Herrera. The evidence shows that Jane's mother wanted Jane to leave the home and for Velasco-Herrera to return home as early as September 2021. The evidence also shows that Jane did leave home shortly after her outcry and while she was still a minor. The jury would have been within its discretion in finding that Jane recanted, not because Velasco-Herrera did not sexually assault her, but because she lost all familial support in the immediate aftermath of her outcry and believed that recanting might restore that support. *See Saldana v. State*, 287 S.W.3d 43, 60 (Tex. App.—Corpus Christi–Edinburg 2008, pet. ref'd) ("A fact finder is fully entitled to disbelieve a witness's recantation."); *see also Keeter v. State*, 74 S.W.3d 31, 38 (Tex. Crim. App. 2002) (explaining that "evidence that recanting witness was subject to pressure by family members" provides basis for disbelieving witness's recantation).

In the letter written on July 13, 2021, Velasco-Herrera apologized to his family for his actions. A defendant's apology may be probative of his guilty conscience. *Perales v. State*, 622 S.W.3d 575, 582 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd); *see Chasco v. State*, 568 S.W.3d 254, 261 (Tex. App.—Amarillo 2019, pet. ref'd) ("That appellant apologized to D.M. is evidence of a consciousness of guilt of his indecent conduct toward her . . . ."). And "consciousness of guilt is perhaps one of the strongest kinds of evidence of

11

guilt." *Harmel v. State*, 597 S.W.3d 943, 955 (Tex. App.—Austin 2020, no pet.) (quoting *Harris v. State*, 645 S.W.2d 447, 456 (Tex. Crim. App. 1983)).

Viewing the evidence in the light most favorable to the jury's verdict, we conclude that the evidence is legally sufficient to sustain Velasco-Herrera's conviction. Accordingly, we overrule his sole issue on appeal.

### III. CONCLUSION

We affirm the trial court's judgment of conviction.

_____

Maggie Ellis, Justice

Before Chief Justice Byrne, Justices Kelly and Ellis

Affirmed

Filed: August 28, 2025

Do Not Publish

12